9-13/WJP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

American Steamship Owners Mutual
Protection and Indemnity Association, Inc., as
Subrogee of Boston Marine Transport, Inc.,

                         Plaintiff,

v.

United States of America, U.S.
Department of Homeland Security, U.S.
Coast Guard and U.S. Coast Guard National
Pollution Funds Center,

                         Defendants.

------------------------------------------------------------x

Civil Action No.:

**COMPLAINT**

Plaintiff, the American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("the American Club" or "Plaintiff") by and through its attorneys, Freehill, Hogan & Mahar, LLP, as and for its Complaint against Defendants, United States of America, United States Department of Homeland Security ("DHS"), United States Coast Guard ("USCG"), and U.S. Coast Guard National Pollution Funds Center ("NPFC"), alleges upon information and belief as follows:

### INTRODUCTION

1. This action seeks judicial review, under the Administrative Procedures Act, ("APA"), 5 U.S.C. §§ 701-706, of certain final agency actions of the NPFC in which the NPFC denied the American Club's claims for reimbursement of certain oil spill damages pursuant to the Oil Pollution Act of 1990 ("OPA"), against the Oil Spill Liability Trust Fund (the "Fund") incurred as a consequence of the December 14, 2012 oil spill from the tank barge BOSTON NO.

482015.1

30 (hereinafter, "BOSTON NO. 30") at Mayship Repair Contracting Corp. ("Mayship") in Staten Island, New York (the "Oil Spill").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (federal question) and OPA, 33 U.S.C. §2717(b).  Jurisdiction to review the NPFC's final agency action is further based on 5 U.S.C. §§ 701-706 (APA).

3.      Venue lies in the Eastern District of New York pursuant to 33 U.S.C. § 2717(b), as the district in which the Oil Spill and resulting damages occurred.

## THE PARTIES

4.      Plaintiff, the American Club, is a New York corporation operating with an office and principal place of business at One Battery Park Plaza, 31st Floor, New York, NY 10004.  It is a mutual marine "protection and indemnity" ("P&I") association or club, which provides P&I insurance to vessel owners and operators worldwide for various marine liabilities, including but not limited to oil pollution exposure and clean-up expenses.

5.      The American Club at all relevant times provided insurance to Boston Marine Transport Inc. ("BMT") covering, *inter alia*, pollution liability for BMT's barge BOSTON NO. 30 in accordance with the terms and conditions of the P&I insurance contract issued by the American Club for the BOSTON NO. 30 for the policy period beginning on February 20, 2012 at 1200 hrs. GMT and terminating on February 20, 2013 at 1200 hrs. GMT.

6.      Non-Party Great American Insurance Company ("GAIC") was the primary insurer for BMT and paid the initial $5,000,000.00 in connection with pollution removal costs relating to the Oil Spill under its policy number OMH3491446 05.  The American Club, as BMT's insurer for liabilities exceeding $5,000,000.00, paid the response and removal costs,

2

482015.1

damages and related expenses arising from the Oil Spill over and above GAIC's contribution under its certificate number 01136000. The American Club is therefore the proper party in this action.

7. At all relevant times, BMT was the owner, operator and responsible party ("RP") under OPA in connection with the barge BOSTON NO. 30. (The American Club and GAIC, as subrogees of BMT, and BMT are collectively referred to herein as "Claimants." The American Club is singularly referred to as the "Plaintiff".)

8. The BOSTON NO. 30 is a tank barge with a gross registered tonnage ("GRT") of 1,634 tons and a length overall ("LOA") of 250.75 feet.

9. The United States of America, as sovereign, is named, *eo nomine*, as a defendant herein. The NPFC administers the "Fund" as an agency, subdivision, office or subordinate unit of the USCG, a service within the DHS, one of the executive departments of the United States of America.

## FACTS

### THE OIL SPILL

10. On December 14, 2012, soon after Superstorm Sandy inflicted extensive storm surge damage on New York Harbor, the BOSTON NO. 30 under tow of the Tug QUENAMES transited the Arthur Kill and the Kill Van Kull with a cargo of Number 6 oil from New York Terminal in Elizabeth, N.J. to Mayship in Staten Island, New York.

11. After berthing at the Mayship yard the BOSTON 30 began transferring oil to the Kirby barge No. DBL 25 ("DBL 25"). During the transfer a sheen was noticed between the vessels. Responsive efforts were immediately undertaken and the required notices given.

12. It was subsequently determined that the hull of the BOSTON 30 had been breached resulting in the discharge of approximately 20,000 gallons of No. 6 oil into the waters surrounding the Mayship yard.

13. The American Club and BMT, based on investigations by their appointed experts, as well as the factual findings of the USCG, maintain that the breach in the hull of the BOSTON 30 could only have been the result of the barge coming into contact with some unknown and uncharted object or debris, during the course of transit in the navigable channel from New York Terminal to the Mayship yard. This conclusion is supported by the absence of any finding or determination by the USCG, or any other person or entity, as to a specific cause of the hull breach either at New York Terminal or the Mayship yard.

14. The American Club and BMT have further maintained that the unknown and uncharted object or debris encountered by the Barge BOSTON 30 en route to the Mayship yard on December 14, 2012 was the result of Superstorm Sandy, which deposited vast amounts of debris into the waters in and around New York Harbor as a result of its historically high storm surge only weeks prior to the Oil Spill.

## CLAIM AGAINST THE FUND

15. In the immediate aftermath of the Oil Spill, Claimants incurred significant expense in responding as expeditiously as possible to provide necessary clean up operations in the areas affected by the spill.

16. In the weeks and months following the Oil Spill, Claimants incurred significant additional expense in responding to, assessing, and, to the extent deemed reasonable, paying, in part or in full, numerous third party damage claims resulting from the Oil Spill. These third

482015.1

party claims consisted in large part of claims by individual recreational boat owners alleging damage to their vessels.

17. Claimants' third party claim damages also included amounts paid to Global Risk Solutions, Inc. ("GRS") for purposes of assessing the damages related to the numerous third party claims which were presented to Claimants following the Oil Spill.

18. Claimants were also presented with and paid, in part, a claim for business interruption losses by Mayship as a result of the Oil Spill. Mayship's claim for business interruption losses was in excess of $3 million, and was assessed and corroborated, in part, during a lengthy, iterative process by a GRS accountant, and ultimately settled for $575,000.00.

19. On December 9, 2015, Claimants submitted their initial claim to the NPFC consisting of the following damages:

| | |
|---|---|
| Response and Removal Costs: | $16,573,913.71 |
| Third Party Damages: | $1,477,158.64 (inclusive of GRS costs) |
| | $575,000 (business interruption loss) |
| USCG Invoice (unbilled): | $305,618.01 |
| Total: | $18,931,690.36 |

(It is noted that an error in the initial claim submission stated the total damages claim was $18,925,690.36.)

20. With respect to the foregoing, the "USCG Invoice" concerns costs allegedly incurred by the USCG arising from the Oil Spill. However, because the NPFC ultimately determined that the RP was able to limit its liability under OPA, this invoice was rendered moot and was never issued to the RP (or to the American Club).

21. Claimants' claim against the Fund sought full exoneration from liability and full recovery of all expenses/damages incurred under OPA under the theories that (i) the Oil Spill

5

was the direct result of an Act of God, and/or (ii) that the Oil Spill was caused solely by the acts and/or omissions of a third party. Alternatively, Claimants sought to enforce the limitation of liability provision under OPA and recover from the Fund all expenses/damages incurred in excess of its statutory liability limit of $6,408,000.

22. Following further exchanges between Claimants and the Fund, Claimants revised their final claim amounts by letter dated February 8, 2017 as follows:

| | |
|---|---|
| Response and Removal Costs: | $15,190,226.83 |
| Third Party Damages: | $ 1,565,606.63 (inclusive of GRS costs) |
| | $ 575,000.00 (business interruption loss) |
| Total: | $17,330,833.46 |

23. Claimants' revised claim for third party damages included the amounts paid to GRS, totaling $1,383,686.97. In its October 21, 2017 reconsideration decision, the NPFC incorrectly noted the GRS claim amount as $1,296,924.32. The $1,296,924.32 figure does not appear to include Marriot Hotel costs in the amount of $86,762.65 for GRS personnel.

**DECISIONS BY THE FUND**

**Response and Removal Costs**

24. The NPFC issued its first decision relating to the Claimants' claim against the Fund relating to the BOSTON NO. 30 oil spill on March 23, 2017 under reference no. B13013-0002. The Fund's initial decision was limited solely to Claimants' application for exoneration or limitation of liability and addressed only the claim for response and removal costs.

25. The NPFC determined in its initial decision that Claimants were not entitled to full exoneration of liability under OPA, but that it was entitled to limit its liability to the statutory

482015.1

limitation amount of $6,408,000, which amount was based on the applicable OPA regulations, 33 C.F.R. 138.230(a)(3), and the GRT of the barge.

26. Based on submission of a total claim for removal costs in the amount of $15,190,226.82, the NPFC disallowed a total of $429,508.69, for a total recovery, after deducting the $6,408,000 limitation value, of $8,352,718.14.

27. On April 27, 2017, Claimants accepted the NPFC's determination and award of $8,352,718.14 for reimbursement of response removal costs. The NPFC's award of response and removal costs is not being challenged in the subject action.

**Third Party Property Damage Claims**

28. The NPFC issued a series of decisions relating to numerous third party claims for oil spill related damage to various personal vessels in March and April 2017. These decisions also covered a claim for reimbursement of survey expenses paid to Capt. Dan Belson. These decisions are summarized in the spreadsheet attached hereto as Ex. A. Based on these decisions, Claimants were awarded a total of $132,728.21.

29. The Claimants have accepted the NPFC's determinations on the third party boat claims and the Capt. Belson claim attached as Ex. A, and those amounts are not being challenged in the subject action.

**GRS Claim**

30. Claimants' total revised claim against the Fund included $1,383,686.97 in expenses paid to GRS.

31. The NPFC issued an initial determination on May 5, 2017 under its reference number B13013-0080 denying Claimants' claim for reimbursement of the GRS expenses in its entirety.

32. In totally denying Claimants' claim for recovery of the GRS expenses, the NPFC relied on various erroneous factual and legal conclusions, including, *inter alia*, that the expenses incurred by GRS represented claim "administrative" services which the NPFC maintains were not recoverable under OPA as opposed to claim "assessment" services which the NPFC acknowledges would be recoverable. The NPFC further erroneously concluded that while some amount of the GRS expenses were "assessment" in nature, the Claimants failed to provide sufficient evidence for the NPFC to determine what amount of services were "assessment" versus "administrative." Additionally, the NPFC erroneously denied recovery of assessment costs where the underlying third party damage claims had been denied by the NPFC.

33. On June 1, 2017, Claimants requested and obtained an extension of time to submit an application for reconsideration of the NPFC's May 5, 2017 decision. Claimants requested and obtained a second extension of time on June 26, 2017.

34. On July 18, 2017, Claimants submitted an application for reconsideration of the NPFC's May 5, 2017 decision.

35. The documents, evidence and materials submitted by the Claimants satisfied the NPFC claims regulations related to third-party damage claims found at 33 CFR Part 136.

36. In support of the application for reconsideration, Claimants advanced both legal and factual arguments, including, *inter alia*, that the NPFC had failed to identify any statutory, regulatory or other legal grounds to support its unilateral assertion that "administrative" expenses incurred in assessing damages related to claims are not subject to reimbursement under OPA and its associated regulations. Claimants further objected to and challenged the NPFC's decision that assessment costs are only recoverable with respect to claims that had been approved by the NPFC.

37. In further support of the application for reconsideration, Claimants provided supporting declarations from Adam Gutman and Michael Perullo of GRS, as well as Capt. Thomas Neumann, President and Senior Response Manager of The Meredith Management Group ("Meredith Management"). Meredith Management was retained by BMT and its insurers to provide personnel, equipment and material for incident management, including cleanup response and claims management. In his role as President and Senior Response Manager, Capt. Neumann oversaw the work of 19 contractors, including GRS. The declarations of Gutman, Perullo, and Neumann attested to, *inter alia*, the fact that specific and quantifiable percentages of time were devoted solely to "assessment" activities versus other type of work.

38. On October 21, 2017, the NPFC issued its "Final" Agency Determination affirming its declination of Claimants' entire claim for reimbursement of the GRS expenses. In doing so, the NPFC failed to give proper and sufficient weight to Claimants' supplemental submissions and the supporting declarations of Messrs. Gutman, Perullo and Capt. Neumann. Further, despite having concluded in its decision that "it is likely that GRS performed some work that would qualify as compensable assessment costs," the NPFC nevertheless rejected the entire claim.

**Mayship's Claim**

39. Claimants' total revised claim against the fund included $575,000.00 representing payment to Mayship for its claim for business interruption/lost profits in connection with the Oil Spill.

40. The NPFC issued an initial determination on April 17, 2017 under its reference B13013-0078 denying Claimants' claim for reimbursement of the payment to Mayship for its business interruption/loss of profit claim.

482015.1

41. The NPFC denied Claimants' claim based on the assertion that Claimants failed to provide sufficient evidence that the loss of profits claimed by Mayship arose from the Oil Spill.

42. On May 16, 2017, Claimants requested and obtained an extension of time to submit an application for reconsideration of the NPFC's April 17, 2017 decision. Subsequent extension requests were submitted on June 9, 2017 and June 27, 2017, both of which were duly granted.

43. On July 18, 2017, Claimants submitted its application for reconsideration of the NPFC's April 17, 2017 denial of the Mayship loss of profit/business interruption claim. The Application for Reconsideration consisted of a letter brief, Affidavit of Mohammad Adam, the founder, owner and president of Mayship, Declaration of Michael J. Perullo, a certified public accountant with GRS who had conducted the assessment of Mayship's business interruption claim, and various supporting photographs.

44. Claimants submitted additional materials to the NPFC regarding the Mayship Business Interruption Claim on November 9, 2017 and again on November 13, 2017 in response to various questions raised by the NPFC.

45. The documents, evidence and materials submitted by the Claimants satisfied the NPFC claims regulations related to claims for lost profits / business interruptions found at 33 CFR Part 136.

46. On November 16, 2017, the NPFC issued its "final" agency determination affirming its declination of Claimants' entire claim for reimbursement of the amounts paid to Mayship in satisfaction of its claim for business interruption/loss of profits claim. In issuing a final declination of the claim, the NPFC failed to give proper and sufficient weight to the supporting evidence presented by Claimants, including the sworn affidavits and declarations of Mohammad Adam, the president and owner of Mayship and declaration of Michael Perullo.

482015.1

Further, despite having observed in its decision that there was "evidence that Mayship Repair was impacted by the removal actions at its facility from December 15, 2012 through January 4, 2013," the NPFC nevertheless proceeded to reject the claim in its entirety.

47. In its denial, the NPFC erroneously concluded, in part, that the "evidence in the administrative record reflects that the $575,000 was a negotiated settlement and was not the loss profits resulting solely from the removal actions conducted at Mayship Repair premises from December 15, 2012 through January 4, 2013."

48. The documentation submitted by Claimants satisfied the NPFC regulations found at 33 CFR Part 136 related to claims submissions for lost profits / business interruption claims, and the NPFC did not base its denial on a lack of sufficient documentation.

## FIRST CAUSE OF ACTION

## THE GRS CLAIM

49. Plaintiff hereby incorporates by reference the preceding paragraphs numbers 1 through 48 as if set forth at length herein.

50. The determination of the NPFC issued on October 21, 2017 denying Claimants' claim for reimbursement of amounts paid to GRS represents a "final" agency determination by the NPFC and an exhaustion of Plaintiff's administrative remedies.

51. Neither OPA nor its associated regulations precludes recovery from the Fund of "administrative" expenses incurred in the course of the assessment of damages claims.

52. Plaintiff has established by a preponderance of the evidence that all of the GRS costs were incurred in connection with the assessment of third-party damages claims and are fully recoverable under OPA and its associated regulations.

53. The NPFC's declination of Claimants' claim for reimbursement of the amounts paid to GRS on the grounds that "administrative" expenses incurred in connection with claims

arising from the Oil Spill are not recoverable from the Fund is based on an erroneous interpretation of the applicable statutory and/or regulatory authority. Further, the NPFC's refusal to allow recovery of costs incurred in connection with claims denied by the NPFC is unsupported by OPA and the associated regulations.

54. The NPFC's denial of Claimants' claim for reimbursement of expenses paid to GRS in the amount of $1,383,686.97 should be set aside as being unreasonable, arbitrary, capricious, an abuse of discretion, contrary to OPA and its associated regulations, or otherwise not in accordance with the law.

## SECOND CAUSE OF ACTION

## THE GRS CLAIM

55. Plaintiff hereby incorporates by reference the preceding paragraphs numbers 1 through 54 as if set forth at length herein.

56. Plaintiff has satisfied its burden of proof by establishing by a preponderance of the evidence that: (i) GRS conducted specific identifiable and quantifiable assessment activities in connection with claims arising from the Oil Spill and (ii) GRS received compensation from Plaintiff for such assessment activities as defined by the NPFC.

57. In its declination, the NPFC admitted, *inter alia*, that it was "likely that GRS performed some work that would qualify as compensable assessment costs," and yet nevertheless proceeded to deny the claim in its entirety.

58. The NPFC's declination of Claimants' claim for reimbursement of the GRS expenses on the grounds that Claimants failed to prove allocation of amounts incurred on "administrative" versus "assessment" activities is premised on an improper analysis and application of the applicable burden of proof. The NPFC has failed to properly consider and afford sufficient weight to the evidence presented by Claimants regarding assessment activities

482015.1

conducted by GRS, including, but not limited to, the declarations of Messrs. Gutman, Perullo, and Capt. Neumann. Thus, even if there was merit in the NPFC's drawing distinctions between "assessment" and "administrative" activities (Plaintiff contends there is no such merit), the NPFC rejected the concept that floors or minimums of pure "assessment" were clearly established.

59. The NPFC's denial of Claimants' claim for reimbursement of expenses paid to GRS in the amount of $1,383,686.97 should be set aside as being unreasonable, arbitrary, capricious, an abuse of discretion, contrary to OPA and its associated regulations, or otherwise not in accordance with the law.

## THIRD CAUSE OF ACTION

## THE MAYSHIP CLAIM

60. Plaintiff hereby incorporates by reference the preceding paragraphs numbers 1 through 59 as if set forth at length herein.

61. The determination of the NPFC issued on October 21, 2017 denying Claimants' claim for reimbursement for the Mayship business interruption/loss of profit claim represents a "final" agency determination by the NPFC and an exhaustion of Plaintiff's administrative remedies.

62. Plaintiff has satisfied its burden of proof by establishing beyond a preponderance of the evidence that Mayship incurred business interruption/loss of profit damages of at least $575,000.00, and that said amount was paid by Plaintiff to Mayship.

63. In its declination, the NPFC conceded, *inter alia*, that there was "evidence that Mayship Repair was impacted by the removal actions at its facility from December 15, 2012 through January 4, 2013," and yet nevertheless denied the claim in its entirety.

482015.1

64. The NPFC's declination of Claimants' claim for reimbursement of the amounts paid to Mayship for its business interruption/loss of profit claim is not supported by applicable statutory and/or regulatory authority. The NPFC's determination is further premised on an improper analysis and application of the applicable burden of proof as well as a failure to properly consider and afford sufficient weight to the evidence presented by Plaintiff in support of its payment of the Mayship business interruption/loss of profit claim, including, but not limited to the affidavit and declaration of Mohammad Adam and declaration of Michael Perullo.

65. The NPFC's denial of Claimants' claim for reimbursement of expenses paid to Mayship in the amount of $575,000.00 should be set aside as being unreasonable, arbitrary, capricious, an abuse of discretion, contrary to OPA and its associated regulations, or otherwise not in accordance with the law.

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Review NPFC's final determinations to deny reimbursement of amounts paid by Plaintiff to GRS and Mayship;

(2) Vacate and set aside those determinations as unreasonable, arbitrary, capricious, an abuse of discretion, contrary to OPA and its associated regulations, and/or otherwise not in accordance with the law;

(3) Remand this matter to the NPFC, ordering that it pay the GRS and Mayship claims in full;

(4) Award Plaintiff its reasonable attorneys' fees, costs, interest and disbursements incurred herein; and

(5) Award Plaintiff such other and further relief as the Court may deem just and proper.

Respectfully submitted
FREEHILL, HOGAN & MAHAR, LLP

By  *Tom Russo*
Thomas M. Russo
*Attorneys for Plaintiff*
*The American Club*
80 Pine Street
New York, NY 10005-1759
(212) 425-1900


FREEHILL, HOGAN & MAHAR, LLP

By _____
William J. Pallas
*Attorneys for Plaintiff*
*The American Club*
80 Pine Street
New York, NY 10005-1759
(212) 425-1900


Dated:  May 3, 2018
        New York, NY

482015.1