UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------X

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC., AS SUBROGEE OF
BOSTON MARINE TRANSPORT, INC.,

     *Plaintiff*,

  -against-

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF HOMELAND SECURITY,
U.S. COAST GUARD AND U.S. COAST
GUARD NATIONAL POLLUTION FUNDS
CENTER,

     *Defendants*.

---------------------------------X

**MEMORANDUM & ORDER**

18-CV-02652 (KAM)(ST)

**MATSUMOTO, United States District Judge:**

     Before the court are cross-motions for summary judgment by plaintiff American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("American Club" or "Plaintiff"), as subrogee of Boston Marine Transport, Inc. ("BMT"), and Defendants, United States of America, United States Department of Homeland Security ("DHS"), United States Coast Guard ("Coast Guard"), and U.S. Coast Guard National Pollution Funds Center ("NFPC").  Plaintiff seeks judicial review, under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*, of NFPC's final agency actions denying American Club's claim for reimbursement of alleged oil spill damages under the Oil Pollution Act of 1990 ("OPA").

**BACKGROUND**

I.   **Regulatory Framework**

A. **The Oil Pollution Act of 1990**

The OPA is the primary federal legislation addressing oil spills into navigable waters of the United States and onto its shorelines.  Enacted in the wake of the *Exxon Valdez* oil spill, the OPA amended the Clean Water Act and addressed the wide range of issues associated with preventing, responding to, and paying for oil pollution incidents.  *See* 33 U.S.C. §§ 2701-2761.  The OPA imposes an effective maritime oil spill regime by establishing "uniform and predictable rules that encourage prevention, quick cleanup, and reasonable compensation."  Steven R. Swanson, *Opa 90 + 10: The Oil Pollution Act of 1990 After Ten Years*, 32 J. Mar. L. & Com. 135 (2001); *see also* S. Rep. No. 101-94, at 2-3 (1989).

B. **Responsible Parties**

Under the OPA, the Coast Guard must immediately be notified of an oil spill and is responsible for taking charge of cleanup operations.  The Coast Guard designates the source of the discharge, known as the "responsible party," or "RP."  33 U.S.C. § 2714(a).  If the source of discharge was a vessel, the responsible party is generally the vessel's owner or operator.  *Id.* § 2701(32).  Responsible parties are generally liable for

2

removal costs and damages resulting from the spill, up to applicable limits of liability.  *Id.* § 2704; *see In re Settoon Towing Co.*, 859 F.3d 340, 344 (5th Cir. 2017) (RPs are "strictly liable for cleanup costs and damages and first in line to pay any claims for removal costs or damages that may arise under OPA.") (citations and internal quotation marks omitted).

A responsible party's liability is capped at a dollar limit based on the gross tonnage of the RP's vessel.  33 U.S.C. § 2704(a)(1-2).  If the cleanup costs exceed the statutory limit, the responsible party can seek to have those excess costs reimbursed by the Oil Spill Liability Trust Fund ("Fund").  *Id.* §§ 2708, 2713.

### C. The Oil Spill Liability Trust Fund

The National Pollution Funds Center ("NPFC") was commissioned in 1991 to implement Title I of the OPA, 33 U.S.C. §§ 2701-2720.  Among other duties, NPFC is responsible for administering the Fund.  *See id.* § 2712, 26 U.S.C. § 9509.  The Fund is a pillar of the OPA framework.[1]  One of its core purposes is to pay claims by any person or organization that has incurred uncompensated removals costs[2] or suffered damages from an oil spill.  33 U.S.C. § 2712(a).  In addition to paying claims for

---

[1]     In the past, the Fund has been financed by a per-barrel excise tax collected on petroleum produced in or imported to the United States.

[2]     "Removal costs" are defined as "costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident."  33 U.S.C. § 2701(31).

uncompensated removal costs and damages, the OPA enumerates five other types of expenses that the Fund may pay for: (1) oil removal consistent with the National Contingency Plan; (2) damages to natural resources; (3) cleanup following a discharge from a foreign offshore unit; (4) federal administrative costs necessary for enforcing OPA; and (5) loans to assist fishermen. *Id.* § 2712.

### D. Compensable Claims

The OPA defines a "claim" as "a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident." 33 U.S.C. § 2701(3). Under limited circumstances, the Fund may reimburse a claim submitted by a responsible party for its uncompensated removal costs and damages. *Id.* § 2713(b)(1)(B). A responsible party must demonstrate that either an absolute defense or limited liability applies before the Fund can reimburse removal costs or damages. *Id.* § 2708(a). Moreover, the responsible party's recovery is limited to the extent its total removal costs and damages, plus the amounts paid to third parties for claims asserted under 33 U.S.C. § 2713, exceeds the statutory cap on the responsible party's liability. *Id.* § 2708(b).

The OPA also limits the types of damages for which a claimant or responsible party may seek compensation. Pursuant to 33 U.S.C. § 2702(b), damages are: (1) injuries to natural

4

resources; (2) injuries to or economic losses from the
destruction of real or personal property; (3) losses of
subsistence use of natural resources; (4) Government losses of
revenues; (5) losses of profits or earning capacity as a result
of loss or destruction of real or personal property or natural
resources; and (6) costs of increased public services. 33 U.S.C.
§2702(b).  In addition, 33 U.S.C. § 2701(5) clarifies that the
damages specified in § 2702(b) include, "the cost of assessing
these damages."

Individuals and entities harmed by an oil spill may
file claims against the responsible party for damages.  However,
to promote settlement and avoid litigation, the OPA establishes
specific procedures, which claimants must follow.  Generally,
third-party individuals or businesses injured by an oil spill
must first present their claims to the responsible party, 33
U.S.C. § 2713(a).  To facilitate third-party claims
adjudications, the OPA requires the responsible party to
advertise its designation as the RP, and the procedures by which
damages claims may be presented to it.  *Id.* § 2714(b); 33 C.F.R.
§§ 136.309–136.313.  Once the responsible party pays the third-
party claimant, the responsible party may seek reimbursement
from the Fund as permitted by 33 U.S.C. §§ 2708(b) and
2713(b)(1)(B), and in the manner prescribed by applicable
regulations.  Under such circumstances, the responsible party,

as a subrogee, stands in the shoes of the third-party claimant and accedes to the third party's rights.

### E. Claim Procedures

NPFC is responsible for adjudicating claims made to the Fund.  The specific manner of making claims to the Fund and making payments from the Fund are set forth in 33 C.F.R. Part 136, "Oil Spill Liability Trust Fund; Claims Procedures; Designation of Source; and Advertisement" ("Claims Regulations"); *see also* 33 U.S.C. § 2712(e)(1) ("The President shall . . . publish proposed regulations detailing the manner in which the authority to obligate the Fund . . . shall be exercised."); *id.* § 2713(e) ("The President shall promulgate . . . regulations for the presentation, filing, processing, settlement, and adjudication of claims under this Act against the Fund.").

Each claim must be in writing for a "sum certain for each category of uncompensated damages or removal costs [] resulting from the incident."  33 C.F.R. § 136.105(b).  The Claims Regulations further specify that each claim must include, at a minimum:

> A general description of the nature and extent of the impact of the incident, the costs associated with removal actions, and damages claimed, by category as delineated in Subpart C of this part, including, for any property, equipment, or similar item damaged, the full name, street and mailing address, and telephone

number of the actual owner, if other than the
claimant.

(*Id.* § 136.105(e)(4).)  Each claim must also state "[t]he

reasonable costs incurred by the claimant in assessing the

damages claimed." *Id.* § 136.105(e)(8).  This "includes the

reasonable costs of estimating the damages claimed, but not

attorney's fees or other administrative costs associated with

preparation of the claim." *Id.*  Additionally, a claimant must

provide any other information that NPFC deems "relevant and

necessary to properly process the claim for payment." *Id.* §

136.105(e)(13).  If NPFC initially denies a claim, a claimant

may seek reconsideration. *Id.* § 136.115(d).

## II.   The Administrative Record

### A.   The Oil Spill and Removal

Shortly before midnight, on December 13, 2012, BMT's

single-hulled tank barge, Boston No. 30 ("BOSTON 30"), arrived

at the New York Terminal in Elizabeth, NJ, where it began

loading over 20,000 barrels of fuel oil from the facility.

(Administrative Record ("AR"), US013607.)[3]  Loading was completed

late on the morning of December 14.  (*Id.*)  Hours later, a

---

[3]     In a case under the Administrative Procedure Act ("APA"), the
Administrative Record sets forth the universe of relevant material facts
reviewable by a court.  *See generally Nat. Res. Def. Council, Inc. v.
Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001) (review is "limited to examining
the administrative record").  Defendants provided the court and Plaintiff
with courtesy copies of the Administrative Record, which, due to file size
constraints, was not filed on the electronic docket.  Citations to the
Administrative Record are captioned herein with the Bates prefix "US___."

tugboat towed BOSTON 30 through the Arthur Kill Waterway and Kill Van Kull Waterway to the Mayship Repair Contracting Corp. ("Mayship Repair" or "Mayship") shipyard in Staten Island. (*Id.*)

That evening, shortly after BOSTON 30 commenced transferring oil to another barge, a crewmember noticed oil in the water between the two vessels. (US013607.) Crews of both vessels immediately halted the oil transfer. (*Id.*) A sorbent boom was placed around both barges. (*Id.*)[4] The National Response Center ("NRC")[5] was notified about the potential spill, but tank soundings onboard both ships did not immediately reveal the spill's source. (*Id.*) Around midnight the next day, BOSTON 30 resumed the oil transfer, but ceased operations soon thereafter, once more oil was discovered in the water between the two barges. (*Id.*) In all, the BOSTON 30 released approximately 30,000 gallons of oil into the water. (*Id.*)

Major oil response activities commenced immediately. (US000699.) Meredith Management Group ("Meredith Management" or "Meredith") was engaged to supply personnel for incident management services. (*Id.*) Clean Harbors Environmental and

---

[4]     A sorbent boom is a selective absorbent that soaks up oil, but not water. It is used to surround oil spills and sheens on top of water sources to prevent further contamination.

[5]     The NRC is the designated federal point of contact for reporting all oil discharges into the environment, anywhere in the United States and its territories, and is staffed by the USCG.

Clean Harbors Cooperative were also hired to provide additional oil spill response personnel and related services. (*Id.*) The majority of oil spill removal operations ended on January 4, 2013, but additional monitoring and maintenance were needed to deal with oil staining on the piers, bulkheads, and shorelines of Mayship. (US000700.) By the week of May 1, 2013, the Coast Guard, New York State Department of Environmental Conservation, and BMT agreed that all of the oil had been removed from surrounding areas—the cleanup was therefore complete. The Coast Guard's investigation disclosed that the source of the spill was a rupture in the hull of BOSTON 30, which occurred in transit between the New York Terminal and Mayship Repair's shipyard. (US000699.)

   **B.   Responsible Party and Vendors**

   BMT accepted designation as a responsible party under the OPA, 33 U.S.C. § 2714, for the December 2012 oil spill. (US000702.) BMT's subrogated primary insurer was Great American Insurance Company of New York ("Great American"). (US012617) Plaintiff, American Club, insured BMT pursuant to an excess coverage policy. (*Id.*) After the spill, BMT and its subrogated insurers, including Plaintiff (collectively, "Claimants"), undertook cleanup efforts and retained vendors to resolve third-party damage claims. Among them, Claimants retained Meredith Management to provide personnel, equipment, and material for

9

incident management, including cleanup response and claims management.  (US012622.)  Meredith, in turn, hired Global Risk Solutions ("GRS") to "[p]rovide personnel, equipment and materials to administer third-party claims as directed by [Meredith] and the American Club."  (US009517.)

GRS's mission was two-fold.  First, GRS determined the area impacted by the discharge and investigated and estimated the type and quantity of damage claims that could be expected.  (US012619.)  Second, GRS assessed and initiated settlement of the individual damages claims.  (*Id.*)  GRS employees were paid for services pursuant to an "agreed rate schedule," which varied according to the employee's position.  (US009518.)  The GRS team assigned to the BMT spill included an office manager, a home office executive, a project manager, a technical/IT supervisor to handle IT support and databases, two telephone operators to answer the toll-free calls and information line, and three adjusters/assessors.  (US012619-20.)  Claimants paid GRS $1,296,924.32 for its services ("GRS Payment").  (US012618.)

**C.   Claims Process**

On December 11, 2015, with the spill remediated and third-party claims resolved, BMT and its insurers submitted a claim to the Fund, pursuant to 33 U.S.C. § 2708, seeking to avoid or limit their liability for the spill under the OPA.  (US000001-687 ("Original Claim").)  On March 23, 2017, NFPC

denied Claimants' request for a full reimbursement from the
Fund, exceeding $17 million in removal costs and third-party
property damages, and rejected Claimants' assertions of absolute
defenses from liability.  (US000688-716 ("Original Decision").)
On the other hand, NFPC found Claimants were entitled to limited
liability under 33 U.S.C. § 2704(a), because BMT timely accepted
responsibility for the oil spill, while cooperating with and
assisting removal operations.  (Original Decision 24.)  NPFC
held that Claimants were entitled to reimbursement of
$8,352,718.14 in removal costs from the Fund, over and above
their liability limit.  (*Id.* 25-26.)[6]

After the Original Decision, NPFC continued to
adjudicate the removal costs and damages claims submitted to the
Fund for reimbursement.  Notably, NPFC reserved decision on
whether certain third-party damages that Claimants paid, and now
sought compensation for, were eligible for reimbursement by the
Fund.  (Original Decision 4.)  In addition to removal costs,
Claimants sought reimbursement from the Fund for sums paid to 77
third-party claimants for incident-related damages.  (*See*
US006871-9516.)  Claimants paid these sums to resolve claims by
recreational boat owners for damages from the spill, such as oil
stains to their boats, floats, and lines.  (*Id.*)  NPFC found 43

---

[6]     The NFPC reimbursed Claimants based on their total asserted removal
costs of $15,190,226, less the limit of liability applicable to BOSTON 30,
$6,408,000, minus an additional $429,508.69 of claimed costs ineligible for
compensation. (*Id.* 27.)

third-party claim payments were OPA-compensable and reimbursed the Claimants accordingly.  (US012621.)

Claimants also sought reimbursement for amounts paid to Dan Belson, a Marine Surveyor, who inspected vessel damages for 47 third-party boats ("Belson Demand").  The NFPC awarded Claimants with a $13,905 reimbursement from the Fund, including for Belson's assessment of injuries to the third parties' property.  (US009508-16 ("Belson Decision").)  NFPC determined that "Capt. Belson's job was damage assessment," because his costs comprised estimation of damages to vessels owned by third parties, including inspecting vessels for damages and providing a report of those inspections.  (Belson Decision 6.)  Captain Belson's inspections, in turn, "included identification of the damages, repair valuations and photographs of the damages." (*Id.* 6-7.)  Moreover, Captain Belson "personally visited local marinas to inspect each claimant's boat and assess the damage," gauge the extent of oil-related damage, the repairs needed to restore the boat to its pre-spill condition, disentangle any damages not caused by the spill, and thus extricate any non-compensable third-party damages claims.  (*Id.* 5-6.)  NFPC therefore determined the Belson Demand was almost entirely reimbursable, given Claimants' thorough documentation of Captain Belson's invoices, including linking Belson's costs to specific claims.  (*See generally* Belson Decision.)

12

D.     **The GRS Decision**

1. The GRS Demand

Claimants sought reimbursement for the $1,296,924.32 GRS Payment from the Fund ("GRS Demand").  GRS assisted Claimants with adjudicating claims made by third parties against BMT as a result of the oil spill.  (US012618.)  The purchase order for GRS's services states that Meredith Management retained GRS, on behalf of BMT, to "[p]rovide personnel, equipment and materials to administer third-party claims . . . ."  (US012607; US009517.)  After its initial review of the GRS Demand, NPFC requested additional corroboration of the "work performed by each GRS employee each day," including a "detailed, hourly breakdown" of each employee's activity.  (US012447; *see also* US012619.)  On April 27, 2017, Claimants responded with additional documentation for the GRS Payment, including an Affidavit in Support by Adam Gutman, Office Supervisor for GRS during the BOSTON 30 project.  (US012619; *see also* US012440-45 ("Gutman Aff.").)

In his affidavit, Mr. Gutman described GRS's two-phase approach to the project that Meredith Management engaged the firm to perform.  In the initial phase, GRS performed a damages assessment and exposure analysis by canvassing and investigating the area impacted by the oil spill.  (Gutman Aff. ¶ 4.)  GRS's primary goal in this phase was to analyze and estimate the type

13

and quantity of damage claims that third parties could be expected to submit. (*Id.*) Once GRS's team was assembled, the second phase involved assessing the individual third-party property damage claims, and "amicably resolving those claims" with the third parties. (*Id.*) Mr. Gutman explained that GRS maintained "Daily Reports/Work Logs" setting forth each employee's daily work hours, as well as "a general activity description for the work performed." (*Id.* ¶ 5.) "[F]or the benefit of the Fund," Mr. Gutman also provided a more detailed description of the work completed by each employee during the project, "so that the Fund can confirm that the work performed by the GRS professionals involved the assessment of, or was completed in furtherance of the assessment of, third party property damage claims." (*Id.*)[7]

The Gutman Affidavit also attached an Excel spreadsheet setting forth details about the individual third-party property claims. (US012448.) The spreadsheet identified the GRS adjuster/assessor assigned to each individual property damage claim, and contained an activity log with specific activity notes for each claim, listed by date and claim number. (*Id.*) The affidavit also attached field note excerpts for two

---

[7]    For example, Mr. Gutman stated that Tony Satira, GRS's Project Manager, was "responsible for the overall management and direction of the Project Team," was "deeply involved in the first phase of the project, involving the initial assessment and analysis of the impacted area, and assessing the likely liability exposure from the oil spill." (*Id.* ¶ 8.)

adjusters/assessors, Charles LaBella and Peter Townsend.  (*Id.*)
Claimants' counsel insisted to NPFC that the supplemental
documentation "readily demonstrate[d] that the work performed by
GRS concerned assessment of third party damage claims."  (*Id.*)

### 2. Initial Decision

On May 5, 2017, NPFC preliminarily denied the GRS
Demand.  (US012604-12 ("Initial GRS Decision").)  NPFC
concluded, based on the description of GRS's work in purchase
orders and invoices, that GRS's costs for administering a third-
party claims program, including travel and living expenses for
employees to manage the claims process, constituted non-
reimbursable administrative costs.  (*Id.* 5-6.)  Even though
damage assessment costs may be reimbursable for valid, paid
claims under §§ 2701(5) and 2702(b) of the OPA, NPFC ascertained
"no authority for reimbursing costs associated with
administering a claims process and adjudicating claims."  (*Id.*
6.)  Here, NPFC found the claimed costs were "expenses incurred
by the responsible parties when they retained GRS for
establishing a claims program."  (*Id.*)

The NPFC Claim Supervisor (hereinafter,
"Adjudicator"), detailed additional impediments to reimbursing
Claimants for the GRS Demand.  Chief among them, was
insufficient documentation of GRS's compensable time and
activities.  The Adjudicator explained that, even if GRS's

damage assessment activities fell within the definition of damages, the record was "insufficient for the NPFC to determine to what extent the GRS services were attributable to damage assessment for properly paid claims versus other non-compensable activities, such as claims administration, adjudication, management and settlement, which are not compensable."  (Initial GRS Decision 8.)  Here, the costs of "running an entire program to assess potential liability for an RP and handle all potential claims and actual claims," did not, in NPFC's view, constitute "reasonable" costs of assessing claimed damages.  (*Id.*)  The Adjudicator further noted that the two GRS adjusters who personally visited local marinas to inspect third-party boats and dockside personal property for damages, were merely verifying the damage assessments that Captain Belson performed. (*Id.* 6-7.)

        In addition, the Adjudicator noted the daily activity reports accompanying the GRS Payment invoices were "very general and provide few details of the work performed."  (*Id.* 7; *e.g.*, US009626 (Daily Activity Report for Charles LaBella, dated Dec. 29, 2012 ("Resume Assessment of Potential Liability exposure in the vicinity as a result of the Oil Spill. Report to Command Post located at Marriott – Newark.")).)  The Adjudicator also found Claimants' supplemental production deficient.  By and large, Peter Townsend and Charles LaBella's notes related to

16

claims administration or reports of oil removal operations, and did not show how much time was spent on each activity. (Initial GRS Decision 7-8.) Some of the notes also represented work related to claims that were not submitted to NPFC for reimbursement. (*Id.* 8.) And although the spreadsheet attached to the Gutman Affidavit provided "better details of the work performed," it did not provide the time spent on each activity and reinforced the predominantly administrative nature of GRS's work. (*Id.*)

### 3. Application for Reconsideration

On June 2, 2017, Claimants requested reconsideration of the Initial Decision. (US012620.) In a letter dated July 18, 2017, Claimants asserted that NPFC erred in denying the GRS Demand. In the main, Claimants argued that the Adjudicator erred by characterizing GRS's work as administrative, rather than as damage assessment activity. (*Id.*) Claimants also argued that, even if some invoices included administrative costs, the GRS Payment should have been at least partially reimbursed. (*Id.*) Finally, Claimants asserted that NPFC erred by denying compensation for GRS costs associated with non-compensable claims. (*Id.*)

Along with the July 18 letter, Claimants furnished two supporting declarations for NPFC's consideration, one by Captain Tom Neumann, Meredith Management's President and Senior Response

17

Manager (US012535-37 ("Neumann Decl.")), and a supplemental submission by Adam Gutman (US012524-34 ("Gutman Decl.")).  Mr. Gutman insisted that the "actual work performed by GRS was principally damage assessments," even though the description of GRS's work in purchase orders and invoices suggested otherwise. (Gutman Decl. ¶ 4.)  Mr. Gutman retroactively attributed 92% of GRS's initial phase work "exclusively to damage assessments." (*Id.* ¶ 5.)  In addition, Mr. Gutman pushed back against the Adjudicator's observation that GRS duplicated work performed by Captain Belson.  Mr. Gutman stated that Captain Belson did not begin his damage assessments until February 12, 2013, at which point GRS had already spent 57 days assessing oil spill damages. (*Id.* ¶ 8.)  Mr. Gutman further asserted that GRS's repair cost valuations in Phase Two were essential to performing damage assessments.  (*Id.* ¶ 10.)  According to Mr. Gutman, the administration of third-party boat claims was the sole reserve of Meredith Management, implying that GRS was focused on assessment activities.  (*Id.* ¶ 13.)  Mr. Gutman added that GRS's business interruption expert, Michael Perullo, handled the "complex and extremely time consuming" task of assessing business interruption damages.  (*Id.* ¶ 14.)

In his declaration, Mr. Gutman provided an estimated allocation of time spent by each GRS employee on assessment

activities versus assessment-related activities, as reflected in the following chart:

| GRS Employee | Direct Damage Assessment Work | Other Type of Damage Assessment-related Work |
|---|---|---|
| David Huff, Home Office Executive | 35% | 65% |
| Tony Satira, Project Manager | 35% | 65% |
| Adam Gutman, Officer Supervisor | 75% | 25% |
| Chris Heywood, Tech/IT | 0% | 100% |
| Michael Perullo, Business Interruption | 95% | 5% |
| Charles LaBella, Adjuster/Assessor | 95% | 10% |
| Peter Townsend, Adjuster/Assessor | 95% | 10% |
| L.D. Maestas, Adjuster/Assessor | 95% | 10% |
| Frank Ziegler, Kristina Anolfo, Operators | 0% | 100% |

(*See id.* ¶¶ 16(a-i); US012567.)[8]

Captain Neumann also characterized GRS's work as assessment activities, and echoed Mr. Gutman's contention that Meredith Management had responsibility for administrative matters.  (*See generally* Neumann Decl.)  According to Captain Neumann, the GRS initial Incident Assessment Team arrived to the scene of the oil spill on December 15, 2012, and reported to him

---

[8]     Despite Mr. Gutman's distinction between assessment work and assessment-related work, Claimants reiterated their "position that **all** work performed by GRS was damage assessments . . . ."  (US012567 (emphasis in original).)

as the BOSTON 30 Incident Management Team representative.  (*Id.* ¶ 5.)  Captain Neumann explained that, as part of the damage assessment process, GRS developed composite repair costs using repair estimates from local marine repair facilities, a "significant and time-consuming undertaking."  (*Id.* ¶ 8.)  As individual claims were submitted, GRS employees "entered the claim information into their computer system, thus initiating the claimant-specific damage assessment activities which included multiple site visits, documenting the claim, determining the cost of repairs, researching the pre- and post-incident value of each boat, and coordination with the oil removal crews to ensure mitigation of the impact of the cleanup as well as minimizing additional impact from the free floating oil."  (*Id.* ¶ 9.)

### 4. Final Decision

On October 21, 2017, NPFC denied the GRS Demand on reconsideration, the final agency action with respect to the GRS Demand.  (*See* US012616-28 ("GRS Decision").)  NPFC undertook a *de novo* review of Claimants' entire submission, including supplemental records.  The NPFC Adjudicator clarified that, "[u]nless the RP/Claimants have shown that the GRS fees are damages within the definition of damages under OPA, the [Fund] is not authorized to reimburse this portion of the claim."  (*Id.* 6.)  Although the Adjudicator acknowledged that GRS likely

performed *some* assessment activities, the record ultimately did
not suffice to establish that GRS's services were attributable
to damage assessment activities for claims compensable under the
OPA. (*Id.*)  Specifically, the record lacked sufficient
documentation of personnel hours and expenses specifically
related to individual claims.  (*Id.* 8.)

NPFC first addressed GRS's third-party claims
management costs.  The Adjudicator allowed that a responsible
party might choose to engage a firm for the purpose of
organizing and managing a third-party claims program that
involves review and adjudication of claims, but affirmed that
"costs to manage the third-party claims program are not OPA
damages that may be reimbursable from the Fund."  (GRS Decision
7.)  Moreover, while Claimants' supplemental documentation
included invoices that showed the time and rates for GRS's
adjusters, they did not establish the amount of time spent on
each of the paid claims or activities performed.  (*Id.*)  These
deficiencies left NPFC unable to calculate GRS's damage
assessment costs.  In any event, the Adjudicator determined that
GRS's invoices substantially pertained to non-assessment
damages.  (*Id.*)

The Gutman and Neumann Declarations did not alter
NPFC's conclusion, and in fact, only corroborated that GRS
incurred costs that were not solely related to the assessment of

individual damages.  (GRS Decision 8.)  As the Adjudicator

noted:

> Captain Neumann explains in his Declaration that the
> GRS Incident Assessment Team's initial responsibility
> was to review the impact of the spill on private and
> commercial property and provide a more detailed plan
> for assessing and estimating the damages.  Mr. Gutman
> explains in his Declaration that the initial
> investigations and assessments were used to determine
> how to staff and organize the GRS team that would be
> working on the damage assessment project.  These
> initial costs were not associated with conducting
> assessment for specific claims but to determine how to
> organize the claims management program.  While they
> may not have been administrative costs associated with
> specific claims—Mr. Neumann states that administrative
> costs for individual claims were conducted by Meredith
> Management—they were costs to administer the claims
> management program itself.

(*Id.*)

The Adjudicator also found Captain Neumann's

statements at odds with the record.  Specifically, Captain

Neumann's statement that Meredith Management provided

administrative support contradicted the purchase order for GRS's

services, which stated that GRS would "[p]rovide personnel, and

materials to administer third-party claims as directed by [the]

Meredith/GA-ERT and the American Club."  (GRS Decision 9.)

Likewise, the Payment Recommendation Form attached to each

invoice noted that GRS's responsibilities were to "handle third-

party damage claims and management . . . ."  (*Id.*)  In sum, NPFC

could not determine the extent, by a preponderance of the

evidence, that GRS's adjusters/assessors performed damage

22

assessment activities, as opposed to non-compensable activities, such as claims administration, adjudication, management, and settlement.  (*Id.* 7, 9.)

Next, the Adjudicator addressed Claimants' reliance on 33 C.F.R. § 136.105(e)(8), which states that each claim for reimbursement from the Fund must include "[t]he reasonable costs incurred by the claimant in assessing the damages claimed." (GRS Decision 8-9.)  The regulation continues, "[t]his includes the reasonable costs of estimating the damages claimed, but not attorney's fees or other administrative costs associated with preparation of the claim."  Claimants posited that the text's specific exclusion of administrative costs associated with claim preparation, implied that all *other* administrative costs were reimbursable.  (*Id.* 10.)  NPFC rejected Claimants' interpretation, and affirmed that costs associated with administering a claims process are not assessment costs, but rather another category of administrative costs that are not recoverable under the OPA.  (*Id.*)  Thus, GRS costs incurred for claims administration, such as answering the toll-free claims and information line, developing project-specific databases, and furnishing IT support, were non-compensable.

NPFC also rejected Claimants' *post hoc* allocation of each GRS employees' time spent performing "direct damage assessment activities," versus "other type of damage assessment-

23

related work." (GRS Decision 11.) The Adjudicator noted the lack of any OPA or Claims Regulations provisions authorizing the Fund to issue reimbursements based on "an unsupported estimated percentage of costs," such as that provided by Mr. Gutman. (*Id.*) As the Adjudicator explained, the OPA and Claims Regulations establish a claims process based on individual, singular claims, which reimburses damages within that single claim, as well as costs associated with assessing the damages for that one claim. (*Id.*) In other words, the Fund did not reimburse costs incurred a generalized claims process, without evidence that said costs pertained to a specific, compensable claim. Thus, Mr. Gutman's allocations, even if credited, did not help the Adjudicator link GRS's costs to specific claims.

Further, the Activity Log spreadsheet provided by Claimants in their April 27, 2017 submission, which listed the third-party claims presented to GRS, claims numbers, and a general description of the GRS personnel activities associated with each third-party claim, omitted specific personnel time and expense information relating to damage assessment activities. (*Id.*) This omission prevented NPFC from calculating OPA-compensable damage assessment costs. After the Initial Decision, NPFC advised Claimants that, "if an adjuster was inspecting a particular [third-party] claimant's vessel on a specific day you should provide documentation that shows the

24

time he started and finished that inspection along with other activities he performed that day." (*Id.*) Claimants failed to provide NPFC with such records for the GRS Payment. By contrast, NPFC reimbursed the Claimants for the Belson Demand because Captain Belson documented the hours he worked and invoiced for each boat. (*Id.*) Thus, unlike the GRS Demand, the Belson documentation demonstrated "the connection between specific costs and specific damages . . . ." (*Id.*)

Finally, NPFC rejected Claimants' argument that they were entitled to reimbursement for the costs of assessing third-party claims that Claimants themselves ultimately denied. (GRS Decision 13.) The Adjudicator reasoned that, even though the Claims Regulations define damages to include the costs of assessing the damages, "[i]f there are no compensable damages, by deduction, there are no reasonable costs of assessing them." (*Id.*)

### E.   The Mayship Decision

#### 1. The Mayship Demand

On April 28, 2014, counsel for Mayship submitted a $1,253,446 demand to Claimants for losses caused by disruption and interruption of shipbuilding and repair work at Mayship's Staten Island shipyard. (*See* US012662-65.) According to Mayship, the "overwhelming presence of the clean-up crew and [their] equipment" in response to the oil spill, substantially

interfered with the performance of the company's work for almost two months.  (US012662-63.)  Mayship claimed the spill and subsequent removal operations caused business interruption, and resultant lost profits, in relation to six vessels: (1) Barge III for Circle Line - $36,319; (2) Manhattan vessel for Circle Line - $36,319; (3) BOSTON 30 for BMT - $79,960; (4) Sterling Equipment Barge - $60,540; (5) Sterling Dredge Barge - $710,194; and (6) Trevcon Barge - $330,114.  (US012665; US013600.)  On October 31, 2014, Mayship agreed to settle its demand against Claimants in exchange for a payment of $575,000 ("Mayship Payment").  (US0012680-84; US013600.)  Claimants, in turn, sought reimbursement from the Fund for the settlement payment ("Mayship Demand").  (US013601.)

At the outset, NPFC expressed skepticism about the Mayship Demand, noting the absence of "any argument or justification by the RP/Claimants for payment of this claim other than submitting it for reimbursement of amounts paid to a third party claimant."  (*See* US013601.)  On May 5, 2016, the NPFC advised Claimants' counsel that the Mayship Demand lacked sufficient documentation to support payment from the Fund.  (US006103.)  NPFC requested documentation to substantiate Mayship's lost profits, the relationship between the oil spill and Mayship's loss, and evidence supporting Mayship's valuations

of lost business.  (*Id.*)[9]  In response, Claimants provided the
following:

> (1) a January 31, 2014 letter from Mayship Repair's
> counsel, Flora Edwards, Esq., which attached
> contractual documents related to the Trevcon and
> Sterling vessels, as well as correspondence regarding
> some of the planned work; (2) notes and documents of
> Michael Perullo, an accountant hired by GRS to oversee
> the claim; (3) correspondence regarding Trevcon's
> breach of contract and liquidated damages claim
> against Mayship Repair arising from the oil spill; (4)
> correspondence between Sterling and Mayship Repair
> allegedly showing how the vessel contracts were
> impacted by the oil spill; and (5) financial
> statements for 2011 through 2014.

(*See generally* US012687-874; *see also* US013602.)

2. Initial Decision

On April 17, 2017, the NPFC preliminarily denied the
Mayship Demand.  (*See* US013595-604 ("Initial Mayship
Decision").)  The Adjudicator examined each component of the
Mayship Demand but could not ascertain what work was planned for
the Barge III and the Manhattan vessels before the oil spill,
much less how the claimed amount was determined.  (US013600.)

---

[9]     NPFC specifically requested the following information:

> (1) work being done and the associated contracts for each of the
> vessels upon which the damages are based; (2) how the liquidated
> damages claimed were due to the oil spill; (3) proof that oil
> spill and/or the response caused the company net losses of
> profit; (4) explanation and calculation showing losses for six
> vessels; (5) how the spill caused each of the claimed losses; (6)
> proof the spill caused the claimed delays; (7) complete audited
> financial statements for 2011 through 2014; (8) the source for
> Mayship Repair's claim calculations, specifically the demand
> summary and loss analyses; and (9) an explanation of how BMT
> arrived at the $575,000 settlement figure with Mayship Repair and
> the documents underlying that calculation.

(*Id.* (edited for length and clarity).)

Likewise, NPFC was unable to  determine how the Claimants arrived at amount sought for the Sterling Equipment Barge repairs.  (*Id.*)  As for the BOSTON 30, although BMT had requested an estimate from Mayship on January 8, 2013 for certain repairs, the request post-dated the oil spill, which cast doubt that the spill had caused Mayship to lose BMT's business.  (*Id.*)  Mayship also had a contract with Sterling Equipment, Inc. ("Sterling"), for the new vessel construction of Sterling Dredge Barge, and with Trevcon Construction Co., Inc. ("Trevcon"), for the Trevcon Barge.  (*Id.* 6-7.)  Claimants asserted that, as a result of construction delays caused by the spill, Mayship not only lost profits on both contracts, but also incurred liquidated damages under the Sterling contract.  (*Id.* 7.)

Overall, NPFC was not persuaded by the documentation of Mayship's business interruption losses.  (Initial Mayship Decision 8.)  The Adjudicator noted that Mayship's shipyard was impacted by the oil spill and subsequent remedial efforts, but the evidence failed to demonstrate how the spill and removal impacted Mayship's business.  (*Id.*)  According to the decision, only one document in the record even mentioned the oil spill, a February 26, 2013 email from Sterling, recalling a statement by Mohammad Adam, Mayship's President, that Mayship could not complete repairs due to the spill.  (*Id.*)  The Adjudicator

28

nevertheless construed the email as confirmation that Sterling instructed Mayship Repair to *proceed* with repairs.  (*Id.*)

At bottom, NPFC determined the evidence was insufficient to show that the oil spill caused Mayship to lose business.  (Initial Mayship Decision 9.)  The Adjudicator also could not determine how the Claimants arrived at the settlement figure of $575,000, and noted that Claimants did not articulate any explanation or calculation to support the Mayship Payment.  (*Id.*)  "Without knowing how the RP/Claimants arrived at the amount paid," the Adjudicator explained, "NPFC cannot determine whether the payment was proper or whether it was the result of a negotiated settlement alone."  (*Id.*)

Similarly, NPFC could not determine which components of Mayship's losses Claimants actually paid for.  (Initial Mayship Decision 9.)  One such component, a liquidated damages claim paid by Mayship to Sterling as a result of construction delays, and supposedly deducted from the settlement with Claimants, was deemed non-compensable for two reasons.  First, Mayship's contract with Sterling permitted delays for circumstances beyond Mayship's control.  (*Id.*)  The stipulated completion date was December 15, 2012, only two days after the oil spill incident, by which time the vessel presumably would have been close to completion.  (*Id.*)  Second, the Adjudicator observed that Mayship performed its shipyard construction in dry

29

docks, not in the water, making it less plausible that the oil spill caused delays in construction. (*Id.*) As for the Trevcon Barge, the Adjudicator could not reconcile the alleged two-month work delay caused by the oil spill, with Mayship Repair's six-month delinquency in completing vessel construction. (*Id.*)

Finally, Mayship's financial statements suggested the company's earnings were somewhat volatile, and its business only sporadically profitable, making it difficult to gauge the cause of Mayship's financial downturn. (Initial Mayship Decision 10.) Mayship Repair had net income of $550,658 for the year ending June 30, 2012, and a net income of $34,269 for the fiscal year ending June 30, 2013. (*Id.*) But in 2011, Mayship operated at a net loss of $104,965, and a net loss of $313,725 in 2014. (*Id.*) The Adjudicator therefore questioned whether the oil spill actually caused Mayship's business losses, given the company's year-to-year financial volatility. (*Id.*)

### 3. Application for Reconsideration

Claimants formally sought reconsideration of the Initial Mayship Decision on May 9, 2017. (*See* US013514.) On July 18, 2017, Claimants submitted additional documentation to NPFC in support of the Mayship Demand. (*See generally* US013531-76.) Claimants' submission included an Affidavit in Support from Mr. Adam, Mayship's President (US013553-66 ("Adam Aff.")), and a Declaration in Support from Michael Perullo, a CPA

employed by GRS during the relevant period (US013567-76
("Perullo Decl.")).

> a. *Supporting Documentation*

Mr. Adam explained that Mayship's business activities,
which consisted of new vessel construction, and repair and
conversion services[10] for existing vessels, were severely
impacted by the December 13, 2012 oil spill.  (Adam Aff. ¶¶ 4,
6.)  Mr. Adam's affidavit sought to substantiate components of
the Mayship Demand, specifically, the six contracts directly
impacted by the oil spill, including four for vessel repairs,
and two for vessel construction:

*Circle Line Barge III and Manhattan (Lost Jobs 1 & 2)*:
Mayship customarily provided dry dock services for its
longstanding clients pursuant to "an oral contract and/or
general understanding."  (Adam Aff. ¶ 9.)  One such client, New
York Cruise Lines, Inc., the parent company of Circle Lines
Sightseeing Yachts ("Circle Line"), requested dry dock services
for four Circle Line vessels from December 7, 2012 through
January 15, 2013.  (*Id.* ¶ 10.)  Other than a November 1, 2012
letter from Cruise Lines' CEO, Mr. Adam stated that Mayship had
no contemporaneous written contracts or documents memorializing

---

[10]    Such services include maintaining and servicing engines, steel
fabrication, welding piping, repairing, painting, scraping, and other
services.

the services provided (*e.g.*, bottom scraping, painting, and general maintenance) or the fees it charged. (*Id.* ¶¶ 10-12.)

Mayship anticipated performing the Circle Line repairs over the course of December 2012, allotting two to three weeks per vessel. Mayship's capacity—only three dry docks—necessitated staggered deliveries of Circle Lines' vessels. The first two would be delivered at the beginning of December, and the subject vessels would be delivered in the latter half of the month. (*Id.* ¶ 13.) The oil spill occurred before the Manhattan and Barge III vessels were delivered to Mayship. (*Id.* ¶ 14.) The spill forced Mayship to suspend operations completely for two weeks, between December 15 and 30, 2012. (*Id.* ¶ 15.) Remedial efforts, specifically the containment boom placed in the spill area, also blocked access to Mayship's dry docks, preventing vessels from entering or exiting. (*Id.* ¶¶ 15-16.) At the time of the spill, Mayship's three dry docks were occupied by two other Circle Line vessels and a Sterling barge. (*Id.* ¶ 16.) As a result, Mayship could not accommodate the Manhattan and Barge III, and New York Cruise Lines was compelled to send the vessels elsewhere for the needed repairs. (*Id.*)

Mr. Adam estimated that losing the Barge III and Manhattan jobs cost Mayship $72,638. (Adam Aff. ¶¶ 17-18.)[11]

---

[11] Mr. Adam calculated that Mayship Repair would have charged $39,500 per vessel; expended approximately 100 man hours each for the Manhattan and Barge

This figure were based principally on data enclosed in two letters from Mayship's counsel, dated January 31 and April 28, 2014.  (*See id.*)

> *BOSTON 30 (Lost Job 3)*: On January 8, 2013, Mayship received an email from Anthony DiCunzolo of BMT, requesting an estimate for routine vessel maintenance.  (Adam Aff. ¶ 20.)  Mr. Adam sent Mr. DiCunzolo a $150,000 estimate for Mayship's services.  (*Id.* ¶ 22.)[12]  Mr. Adam further estimated that Mayship would have expended $70,040 in costs to complete the project, resulting in earned profits of $79,960.  (*Id.*)  The continuous presence of spill response and cleanup crews, their vehicles and equipment, and the containment boom in particular, conspired to bar access to Mayship's dry docks, and caused Mayship to forfeit the BOSTON 30 opportunity.  (*Id.* ¶ 23.)  In mid-January 2013, BMT decided it could not delay the project any longer, and turned to a different shipyard to perform the repairs and maintenance.  (*Id.* ¶ 24.)

> *Sterling Equipment, Inc. – Barge Repair* (Lost Job 4): Sterling, another longstanding Mayship customer, approached Mayship in mid-December 2012 for a barge repair project.  (Adam Aff. ¶ 25.)  Mr. Adam prepared an estimate of the repairs.  (*Id.*

---

III, at an average labor cost of $24.31 per hour; incurred $3,181.00 in costs for materials.  (*Id.* ¶ 18.)

[12]   The Adam Affidavit attached a handwritten itemized estimate for the price quoted to BMT. (*Id.*)

¶¶ 26-28.)  He assumed total costs of $20,180, comprising 274 hours of labor, at $70 an hour, as well as $1,000 expensed for materials to complete the work.  (*Id.* ¶ 27.)  Mr. Adam deduced that Mayship would have charged Sterling $80,720 for the work, because the cost to fulfill a project of that size is usually 25% of the contract price.  (*Id.* ¶ 28.)  Therefore, Mayship's anticipated profits would have been $60,540.  (*Id.*)

The Sterling Barge was delivered to Mayship and placed in its dry dock in the middle of December 2012, but spill-related interference and subsequent cleanup prevented Mayship workers from performing the contracted repairs.  (Adam Aff. ¶ 29.)  In February 2013, Mr. Adam was forced to inform Sterling that, due to the spill, Mayship could not perform the repair work in a timely manner.  (*Id.* ¶ 30.)

*Sterling Equipment, Inc. – Dredge Barge Construction (Delayed Job 1)*:  In August 2012, Mayship entered into a contract with Sterling for construction of a new dredge barge, with a contemplated delivery date of December 15, 2012, eventually extended to December 28.  (Adam Aff. ¶ 33.)  As a result of the spill, however, construction was not completed until May 15, 2013.  (*Id.*)  The initial contract price for construction was $1.9 million, but contract modifications ultimately pushed the price to $3,240,940.  (*Id.* ¶ 34.)  Mayship initially anticipated fulfillment costs exceeding $3 million,

34

resulting in estimated profits of $206,612, but the oil spill and ensuing cleanup increased Mayship's labor and other costs. (*Id.* ¶¶ 35-36.)  In the end, Mayship absorbed an actual loss of $302,642 on the project.  (*Id.* ¶ 36.)  Mr. Adam calculated that Mayship suffered lost profits of $509,254, the sum of its actual loss and anticipated profits, as a result of the oil spill. (*Id.*)[13]

The Adam Affidavit described additional aggravating factors.  The Sterling construction contract included a liquidated damages provision: for every day past the vessel's stipulated due date, Mayship was to pay $10,000 to Sterling. (Adam Aff. ¶ 37.)  Sterling assessed total liquidated damages of $200,940 due to the construction delays.  (*Id.*)  Mayship's losses thus swelled to $710,194.  (*Id.* ¶ 38.)

*Trevcon Construction Co., Ltd. – Load Lined Deck Barge Construction (Delayed Job 2)*: Trevcon agreed to pay Mayship $1,387,500 for a new vessel construction.  (Adam Aff. ¶¶ 44-45.) Mayship anticipated profits of $88,454.  (*Id.* ¶ 46.)  As a result of the oil spill, costs increased to the point where Mayship incurred an actual loss of $241,660 under the contract, and an expectation loss of $330,114.  (*Id.* ¶ 47.)  Mr. Adam

---

[13]    Mr. Adam explained that it is difficult, if not impossible, for Mayship to replace its highly-skilled welders and laborers once retained for construction, so Mayship continues to pay the workers even if circumstances prevent them from performing their jobs.  (*Id.* ¶ 39.)

calculated that Mayship lost profits totaling $1,253,446 as a result of the oil spill.  (*Id.* ¶ 50.)

Claimants adduced further support for the Mayship Demand from Mr. Perullo, whose role it was to assess and evaluate the Mayship's losses for GRS.  (Perullo Decl. ¶ 4.) According to Mr. Perullo, GRS "stressed [to Mayship] that valid claims for lost profits and/or earning capacity must be substantiated by proof that the damages were caused by the [oil spill], and that the amounts claimed were appropriate."  (*Id.* ¶ 5.)  Mayship originally asserted a business interruption claim in excess of $3 million, but ultimately whittled its demand to $1,253,446.  (*Id.* ¶¶ 6-7.)  According to Mr. Perullo, GRS corroborated the lost profits for the four lost jobs by "subtracting the costs to fulfill each job from the gross contract price for each job."  (*Id.* ¶ 8.)  GRS was satisfied that Mayship lost the jobs due to the oil spill "based on [GRS's] thorough review of this matter[.]"  (*Id.*)

As for the two Delayed Jobs, Mr. Perullo focused on the "Earnings from Contracts," set forth in Mayship's financial statements from 2011-2014, to assess the impact of the oil spill.  (*Id.* ¶¶ 17,19.)  Mr. Perullo reported that, in FY2013, the year of the spill, Mayship derived 37% of its revenue from the Sterling dredge barge construction, albeit with -5% gross profit.  (*Id.* ¶ 22.)  The Trevcon barge construction constituted

12% of FY2013 revenue, but at -21% gross profit.  (*Id.* ¶ 23.)
In total, the two Delayed Jobs accounted for gross losses
comprising 9% of recognized revenue.  (*Id.* ¶ 24.)  Mr. Perullo
also noted that Mayship lost money on another high value
contract in FY2013, unrelated to the oil spill, but stopped
short of providing further detail.  (*Id.* ¶ 25.)  Mr. Perullo
added that "fluctuations in the number of high value contracts
[Mayship enter into] are indicative of the market conditions
within which Mayship operates."  (*Id.* ¶ 26.)  He also
acknowledged that "the nature of Mayship's business and size
make it difficult to corroborate the impact of business
interruption by conducting a macro-level Financial Statement
analysis."  (*Id.* ¶ 27.)

As for the Mayship Payment, Mr. Perullo stated that
GRS was able to corroborate $213,810 in business interruption
losses for the four Lost Jobs.  (Perullo Decl. ¶ 30.)  Citing
Earnings from Contracts for FY2013 and 2014, Mr. Perullo
concluded that Mayship incurred an actual Gross Loss of $142,069
for the Sterling Job, in addition to $200,940 in liquidated
damages, meaning the Sterling Job actually lost $349,009.  (*Id.*
¶ 33.)  According to Mr. Perullo, the actual Gross Loss for the
Trevcon Job was $182,566.  (*Id.*)  Mr. Perullo calculated that
Mayship lost $738,713 in the aggregate for the four Lost Jobs
and two Delayed Jobs.  (*Id.* ¶ 34.)  Further, Mayship treated the

liquidated damages component as a contractually obligated price reduction under GAAP. (*Id.* ¶ 35.) In conclusion, Mr. Perullo stated that "the $575,00 settlement ultimately agreed upon was a substantiated bona fide financial exit for Boston Marine given the multivariate controllable and uncontrollable circumstances surrounding the [oil spill]." (*Id.* ¶ 36.)

b. *COTP Order*

On August 15, 2017, NPFC notified Claimants' counsel that it had obtained copies of the US Coast Guard's Captain of the Port Order 126-12 ("COTP Order"), which suspended operations at the pier leased by Mayship beginning on December 20, 2012. (US013688.) The COTP Order deemed Mayship's pier unsafe for personnel and vessels, and prohibited commercial vessels from mooring or using the pier, due to safety concerns relating to structural integrity and debris in the aftermath of Hurricane Sandy. (*Id.*) NPFC also referred to a letter from Mr. Adam, dated February 25, 2013, requesting an extension of time to complete a final survey and acknowledging the pier's need for emergency repairs. (*Id.*) Although the COTP Order was rescinded on December 10, 2013, NPFC believed the records "indicate[d] that Mayship Repair was prohibited from operating due to structural safety and hazardous navigation conditions and *not oil spill response operations*." (*Id.* (emphasis added).)

38

On September 15, 2017, Claimants' counsel responded that the COTP Order had no impact on Mayship's vessel repair or vessel construction operations, because the pier in question was 500 feet away from the dry docks where Mayship performed its vessel repairs. (US013478.) Moreover, Mayship performed its construction operations on land in a large warehouse, and in an outdoor workspace. (US013478-79.) Accordingly, Claimants stated that the pier's closure did not affect Mayship's repair or construction activities, and had no impact on its business interruption losses asserted in the Mayship Demand. (US013479.)

Finally, on November 13, 2017, Claimants submitted a supplemental declaration from Mohammad Adam. (US013509-11 ("Adam Supp. Decl.").) In pertinent part, Mr. Adam explained that Mayship "undertook certain efforts in order to limit the financial effects that the oil spill had on its business," but the success of those efforts was constrained because the oil spill remediation completely incapacitated Mayship's ability to use its dry docks. (*Id.* ¶ 5.) As such, losses could not be mitigated with alternative business contracts. (*Id.*) Nor was it possible to reduce labor costs because, as detailed in the Adam Affidavit, Mayship was obligated to continue paying its employees given uncertainty about the duration of the oil spill fall out, and the difficulty of replacing Mayship's highly skilled laborers on short notice. (*Id.* ¶ 6.)

39

4. Final Decision

On November 16, 2017, NPFC denied the Mayship Demand on reconsideration, the final agency action on the matter. (US013606-17 ("Mayship Decision").)  NPFC first considered whether the oil spill and cleanup impacted Mayship's business operations.  (*Id.* 6.)  The Adjudicator acknowledged that "some evidence" suggested Mayship's business was impacted during the period from December 15, 2012 though January 4, 2013.  (*Id.*) Removal actions were conducted at Mayship's premises, and the Adam Affidavit stated that Mayship's operations were completely suspended for two full weeks between December 15 and 30, 2012, because cleanup crews were mobilized on Mayship's premises. (*Id.*)  Claimants also provided Ticket Records from August 1, 2012 to October 16, 2013 for welder, labor, and supervisor time for Sterling barge construction activities.  (*Id.*)  Notably, the employees working on the Sterling barge did not record time from December 15, 2012, the date of the spill, through December 30, 2012, but began recording their time again on December 31, and recorded it continually through May 20, 2013.  (*Id.* 6-7.) Claimants also provided no time records for the four Lost Jobs. (*Id.* 7.)

More fundamentally, although Mr. Adam attested to the continued presence of cleanup crews, Claimants did not provide specific evidence of such presence.  (Mayship Decision 7.)  In

40

fact, the Adjudicator found "no indication of a continued presence of response crews." (*Id.* 8.)  The record only revealed "intermittent monitoring and response activities" at Mayship facilities after January 4, 2013, when the majority of removal actions were completed, and some periodic monitoring thereafter. (*Id.* 7-8.)  The Adjudicator also noted that the absorbent boom was placed landside of the piers and docks, in a manner that presumably would not impede vessel access to the premises or dry docks.  (*Id.* 8.)  In sum, the Adjudicator found by a preponderance of the credible evidence that there was no continued presence of oil spill response personnel that impacted the activities or productivity of Mayship's employees.  (*Id.*)

Next, NPFC considered whether the COTP Order impacted Mayship's operations and purported business interruption losses. NPFC recounted that, in October 2012, Hurricane Sandy caused significant storm surge levels.  (Mayship Decision 8.) Following the oil spill, US Coast Guard responders investigated the Mayship repair facility and noted significant debris in the waters and the vicinity of Mayship's facility and pier, which posed a pollution and navigation hazard.  (*Id.*)  The COTP Order, dated December 20, 2012, effectively suspended operations at Mayship's pier, and was not rescinded until December 10, 2013. (*Id.* 8-9.)  Notwithstanding Claimants' assertion that the COTP Order had no bearing on Mayship's drydock operations, NPFC

acknowledged that the COTP Order may have been broad enough to plausibly interfere with Mayship's business activities. (*Id.* 9.)  For instance, the COTP Order suspended all pier operations, and prohibited all commercial vessel movements involving the pier. (*Id.*)  And though the COTP Order did not expressly reference Hurricane Sandy, the Adjudicator noted that news articles around the time of the storm quoted Mr. Adam describing Sandy's severe impact on Mayship's shipyard, and including $2.5 million in estimated damages to equipment and facilities. (*Id.*)

Finally, NPFC considered whether the $575,000 settlement payment to Mayship was compensable under the OPA. (Mayship Decision 10.)  NPFC concluded that, even if removal actions were solely to blame for Mayship's business interruption losses, Claimants did not substantiate that Mayship lost $575,000 in profits from December 15, 2012 to January 4, 2013, the period of major removal operations. (*Id.*)  The Adjudicator explained that as a responsible party, BMT and its subrogated insurers, Plaintiff and Great American, were free to pay a third party without taking the OPA or Claims Regulations into account. (*Id.*)  But, once Claimants sought reimbursement from the Fund, they became OPA "claimants" and, therefore, bound by the requirements of the OPA statute and Claims Regulations. (*Id.*) There was "persuasive evidence" in the record that the $575,000 Mayship Payment was a "negotiated settlement," untethered to

"actual documented losses resulting from a two-week suspension of operations for removal actions." (*Id.*) The Adjudicator noted that no written contracts or cancellation records were provided for the four Lost Jobs. (*Id.* 11.) Further, the Release and Settlement Agreement executed between Mayship and Claimants on October 31, 2014, did not discuss the rationale for the settlement or describe the lost value for any of the contracts. (*Id.*)

The Adjudicator commented that Mr. Perullo calculated total losses of $537,773 in his declaration, bolstering the inference that the Mayship Payment, which exceeded that sum by nearly $40,000, was a product of negotiation rather than actual, verified losses. (Mayship Decision 12.) The Adjudicator further implied that Mayship's financials were unpersuasive as evidence of lost profits, and further remarked that the $575,000 settlement exceeded Mayship's combined annual profits for fiscal years 2011 to 2014. (*Id.; see also id.* n.38.) Moreover, the Adjudicator emphasized Mr. Perullo's concession that neither he nor Claimants were in possession of Mayship's financial statements when the settlement was executed, thereby supporting that the Mayship Payment was the product of a negotiated settlement, rather than a contemporaneous calculation of Mayship's legitimate business interruption losses. (*Id.*) Thus, NPFC found that the Mayship Demand sought reimbursement for a

43

negotiated settlement, which is not permitted under the OPA, rather than lost profits due to removal actions, which are compensable. (*Id.*)

**F.   Federal Lawsuit**

On May 4, 2018, the American Club filed the instant action in the Eastern District of New York, seeking judicial review of the GRS and Mayship Decisions, pursuant to the APA. (ECF No. 1, Complaint ¶ 1.)  On July 25, 2019, Plaintiff served its motion for summary judgment, which seeks a court order setting aside NPFC's determinations.  (ECF No. 26, Notice of Motion for Summary Judgment.)  With respect to the GRS Decision, Plaintiff contends, *inter alia*, that NPFC misconstrued the distinction between assessment costs and administrative costs, resulting in an arbitrary and capricious determination.  (ECF No. 28, Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl.'s Mot.") 9.)  As for the Mayship Decision, Plaintiff contends NPFC ruled in contradiction to its own factual findings that Mayship's business was directly impacted by the oil spill. (*Id.* 27, 30.)

**STANDARDS OF REVIEW**

**I.   Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56, "[a] motion for summary judgment may properly be granted — and the grant of summary judgment may properly be affirmed — only where

44

there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)) *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Typically, in deciding a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). To defeat a motion for summary judgment, the non-moving party must identify probative, admissible evidence from which a reasonable factfinder could find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-257 (1986). If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted).

In an APA case, the court relies on the administrative record for the material facts to determine if the agency's

decision exceeds the agency's statutory authority or is arbitrary and capricious or an abuse of discretion. *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("[A] district court's review under the arbitrary and capricious standard is limited to the administrative record."); *Brezler v. Mills*, 220 F. Supp. 3d 303, 307 (E.D.N.Y. 2016) ("[B]ecause this is an APA review, the Court has relied upon only the administrative record in reaching its holding.").  When a party seeks review of agency action under the APA, the "entire case on review is a question of law" such that "[j]udicial review of agency action is often accomplished by filing cross-motions for summary judgment." *Connecticut v. U.S. Dep't of Commerce*, No. 04 Civ. 1271(SRU), 2007 WL 2349894, at *1 (D. Conn. Aug. 15, 2007) (citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001)); *Glara Fashion, Inc. v. Holder*, No. 11-CV-889, 2012 WL 352309, at *5 (S.D.N.Y. Feb. 3, 2012) (whether agency action is arbitrary or capricious is legal question to be resolved on agency record).[14]

## II.  Scope of Review Under the APA

The APA instructs courts to "hold unlawful and set aside agency action" that is "in excess of statutory . . .

---

[14]    It follows that Rule 56.1 Statements of Material Facts are not required on APA review. *Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 n.7 (S.D.N.Y. 2012) (statements of undisputed facts are not necessary in an APA review case because review presents only a question of law); *Glara Fashion*, 2012 WL 352309, at *1 n.1 (no Rule 56.1 Statement required in APA case because court's decision is based on administrative record) (citing *Am. Bioscience*, 269 F.3d at 1083).

authority."  5 U.S.C. § 706(2)(C).  In reviewing an agency's statutory authority, or lack thereof, "the question . . . is always whether the agency has gone beyond what Congress has permitted it to do."  *Nat. Res. Def. Council, Inc. v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018) (quoting *City of Arlington v. F.C.C.*, 569 U.S. 290, 297–98 (2013)).

### A. Statutory and Regulatory Interpretation

The analysis differs depending on whether the agency decision rests on an interpretation of a statute or regulation. If the agency is exercising authority pursuant to statute, and is charged with administering that law, then the two-step *Chevron* analysis controls.  *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also Arlington*, 569 U.S. at 296–301 (when "confronted with an agency's interpretation of a statute it administers," courts should apply *Chevron* to "ambiguit[ies] that concern[ ] the scope of the agency's statutory authority").  At step one, *Chevron* instructs the court to consider "whether 'Congress has directly spoken to the precise question at issue' because, if 'the intent of Congress is clear, that is the end of the matter.'"  *New York v. F.E.R.C.*, 783 F.3d 946, 954 (2d Cir. 2015) (quoting *Chevron*, 467 U.S. at 842).  To determine if Congress spoke clearly, the court employs "the ordinary tools of statutory construction."

*Arlington*, 569 U.S. at 296.  These tools include the "statutory text, structure, and purpose as reflected in [the statute's] legislative history," and, if the text is ambiguous, "canons of statutory construction."  *Catskill Mountains Chapter of Trout Unltd., Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017).

If the statute is "silent or ambiguous with respect to the specific issue," the court moves on to step two.  *Chevron*, 467 U.S. at 843.  At step two, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.*  This "inquiry is deferential, asking only whether the agency's interpretation is 'reasonable,' while 'respect[ing] legitimate policy choices' made by the agency."  *New York*, 783 F.3d at 954 (alteration in original) (quoting *Chevron*, 467 U.S. at 843–44, 866).  Still, under either step of *Chevron*, "[a]n agency construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority."  *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003).

If an agency is interpreting its own regulation, rather than a statute, it may be entitled to *Auer* deference. *Auer* deference applies only if the regulation at issue "is genuinely ambiguous."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415

48

(2019).  To determine if a regulation is genuinely ambiguous, "a court must exhaust all the 'traditional tools' of construction." *Id.* (quoting *Chevron*, 467 U.S. at 843 n.9).  An ambiguity can only be found when the "legal toolkit is empty and the interpretive question still has no single right answer"; "[i]f uncertainty does not exist, there is no plausible reason for deference."  *Id.*  Even where genuine ambiguity lies, an agency's regulatory interpretation must still be reasonable to warrant deference.  *See id.*  What's more, a reasonable interpretation of an ambiguous rule may not be entitled to deference.  For example, "a court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack,'" because, in order to receive deference, the agency's interpretation "must reflect 'fair and considered judgment.'" *Id.* at 2417 (alteration in original) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

### B. Factual Findings

If the agency action was authorized, the court must consider whether the agency's decision "was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (citing 5 U.S.C. § 706(2)); *see also United States v. Int'l Bhd. of Teamsters*, 170 F.3d 136, 143 (2d Cir. 1999).  In making that

determination, the court's review is limited to the administrative record.  5 U.S.C. § 706; *Int'l Bhd. of Teamsters*, 170 F.3d at 143.  "The scope of review under the 'arbitrary and capricious' standard is narrow, and courts should not substitute their judgment for that of the agency."  *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007) (citation omitted); *see also Gully v. Nat'l Credit Union Admin.*, 341 F.3d 155,163 (2d Cir. 2003) ("Our review under these standards is narrow and 'particularly deferential.'") (quoting *Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd.*, 247 F.3d 437, 441 (2d Cir. 2003)).

Courts "will not disturb a factual finding if it is supported by reasonable, substantial, and probative evidence in the record when considered as a whole."  *Jian Hui Shao v. Mukasey*, 546 F.3d 138, 157–58 (2d Cir. 2008) (citing *Wu Biao Chen v. INS*, 344 F.3d 272, 275 (2d Cir. 2003)) (internal quotation marks and further citations omitted).  This is a very deferential standard.  Only if the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or [one] so implausible that it could not be ascribed to a difference in view or the product of agency expertise," will the decision be overturned.  *Karpova*, 497 F.3d. at 267-268.  In other words, the court will uphold an agency's decision "so long as the agency examines the relevant data and has set out a satisfactory explanation, including a rational

connection between the facts found and the choice made." *Id.* at
268 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State
Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also
Gully*, 341 F.3d at 163.

## DISCUSSION

### I.   The GRS Decision

Plaintiff challenges the GRS Decision on two broad
grounds.  First, Plaintiff asserts NPFC misinterpreted the OPA
and Claims Regulations.  Specifically, Plaintiff contends NPFC
misconstrued its regulations by holding that administrative
costs incurred in connection with a third-party damages claim
are generally not eligible for reimbursement.  In addition,
Plaintiff challenges NPFC's reasoning that Claimants' failure to
link GRS's invoiced costs with specific third-party claims
warranted denying the GRS Demand.  This presents an indirect
challenge to NPFC's construction of several OPA statutes.
Second, Plaintiff argues that NPFC failed to consider the
evidence before it and imposed an elevated evidentiary burden on
Claimants.  Plaintiff's challenge to the GRS Decision fails on
both grounds, as explained below.

#### A. NPFC Properly Interpreted the Relevant Law

##### 1.    Regulatory Interpretation

Plaintiff contends NPFC predicated the GRS Decision on
an erroneous interpretation of the Claims Regulations.

51

According to Plaintiff, the GRS Decision is not entitled to deference because the "clear and unambiguous language" of 33 C.F.R. § 136.105(e)(8) demonstrates that "all administrative costs not associated with preparation of the claim are recoverable under OPA," (Pl.'s Mot. 10), and even if the regulation was "genuinely ambiguous," NPFC's interpretation was nonetheless unreasonable.  (*Id.* 12-18.)  For the reasons explained below, the court finds NPFC properly construed § 136.105(e)(8) and determined that administrative costs are not compensable under the OPA.

NPFC denied the GRS Demand partly because the Claimants could not extricate GRS's invoices for genuine damage assessment activities, from general administrative costs for running a claims-processing program, such as answering the toll-free claims and information line, developing project-specific databases, and furnishing IT support.  (GRS Decision 10.) Claimants' failure to show how much time was spent on each activity left NPFC unable to rationally distinguish which costs were properly allocable to compensable assessment activity as opposed to non-compensable administrative tasks.

Preliminarily, it is worth clarifying the distinction between assessment and administrative costs.  Plaintiff is correct that the OPA and Claims Regulations do not define "damage assessment activity."  (Pl.'s Mot. 24.)  Coherent

definitions may be reasonably deduced, however, from the
Administrative Record.  In the Belson Decision, NPFC listed
numerous examples of compensable assessment costs, including:
estimation of damages to third-party vessels; inspecting vessels
for damages and providing a report thereon; gauging the extent
of oil-related damage and repairs needed to restore a vessel to
its pre-spill condition; and extricating non-compensable third-
party damages from a claim.  (*See* Belson Decision 5—7.)
Plaintiff, a party to the Belson Decision, appears to have
settled on a similar understanding on damage assessment
activities.  For example, Mr. Gutman's Declaration in support of
the GRS Demand described GRS's assessment activities as
"viewing, observing, investigating, valuing," and "physical
activities to assess the nature and scope of damage in order to
determine worthiness and value of specific damage."  *See* Gutman
Decl. ¶ 5.  Plaintiff avers that "administrative" costs, by
contrast, involve activities such as logistical support
services, including preparing reports, IT, and maintaining a
database, all of which are reflected in GRS's invoices, although
Plaintiff notes that "those costs were incurred solely in
furtherance of conducting damage assessments."  (Pl.'s Mot. 10
(record citation omitted).)  The Initial GRS Decision also
considered travel and living expenses for employees managing the

claims process to be administrative in nature.  (Initial GRS Decision 5-6.)

Turning to the relevant regulation, it states that "[e]ach claim must include":

> The reasonable costs incurred by the claimant in assessing the damages claimed. This includes the reasonable costs of estimating the damages claimed, but not attorney's fees or other administrative costs *associated with preparation of the claim*.

33 C.F.R. § 136.105(e)(8) (emphasis added).  Plaintiff maintains that, "associated with preparation of the claim," modifies, and thereby limits, the scope of non-compensable "administrative costs."  (Pl.'s Mot. 9.)  Thus, Plaintiff contends that administrative costs are generally OPA-compensable unless they are associated with claim preparation.  (*Id.*)  The NPFC Adjudicator disagreed.  According to the Adjudicator, "it is not correct to state that the only administrative costs that are not recoverable are those associated with claim preparation and that all other administrative costs are therefore recoverable . . . ."  (*Id.* 10 (quoting GRS Decision 10).)  The court agrees with NPFC.

Plaintiff proclaims that 33 C.F.R. § 136.105(e)(8) is clear and unambiguous.  To determine if that is so, the court will utilize the "traditional tools" of construction, looking particularly to the text and structure of 33 C.F.R. § 136.105(a), and the statute from which it derives authority,

54

just as the Supreme Court instructed in *Kisor*.  The court notes,
however, that if *Kisor* curtailed the deference afforded to
interpretations of non-ambiguous regulations, that limitation is
presumably immaterial if the agency's regulatory interpretation
is nonetheless firmly in accord with regulation's plain,
unambiguous wording.  So it is here.

Plaintiff insists 33 C.F.R. § 136.105(e)(8) authorizes
recovery from the Fund of a discrete, but broad category of
costs: all administrative expenses except those associated with
preparing a claim for damages.  But neither the plain wording of
the immediate text, nor the broader regulation of which it is
part, support such an interpretation.  The court first considers
the words of the text.  *Doe v. Leavitt*, 552 F.3d 75, 83 (1st
Cir. 2009) ("The plain meaning of the words in the text of a
statute constitutes the proper starting point for interpreting
that statute."); *see also Hughes Aircraft Co. v. Jacobson*, 525
U.S. 432, 438 (1999).  Subparagraph (e)(8) requires that claims
for reimbursement from the Fund state the costs reasonably
incurred in assessing claimed damages, which, it clarifies,
includes the costs of estimating damages.  The text then omits
the administrative costs of preparing the claim, as well as
attorneys' fees, from the ambit of "reasonable costs."
Plaintiff asserts that by specifically omitting a category of
administrative cost, the regulation countenances reimbursement

55

for *all other* administrative costs.  This sweeping
interpretation is unsupported by the text.  Under the *casus
omissus pro omisso habendus est* canon, a law "should not be read
to include matter it does not include."  *Envtl. Integrity
Project v. Envtl. Prot. Agency*, No. 18-60384, 2020 WL 4686995,
at *6 (5th Cir. Aug. 13, 2020); *see, e.g.*, *Lamie v. U.S. Tr.*,
540 U.S. 526, 538 (2004) (rejecting construction that "would
have us read an absent word into the statute" because it "would
result not in a construction of the statute, but, in effect, an
enlargement of it by the court") (citation omitted).

Plaintiff invokes *expressio unius est exclusio
alterius*, the interpretive canon that expressing one item of an
associated group or series excludes another left unmentioned.
Plaintiff asserts that, "[b]y expressly excluding only those
administrative costs associated with preparation of the claim,
an appropriate reading of this regulation is that other types of
administrative costs, such as those incurred in furtherance
performing damage assessments, are recoverable."  (ECF No. 32,
Plaintiff's Reply Memorandum of Law in Support of Summary
Judgment and in Opposition to Defendants' Cross-Motion for
Summary Judgment ("Pl.'s Reply") 4.)

The Supreme Court has posed the following hypothetical
to illustrate the *expresio unius* doctrine's operation: "If a
sign at the entrance to a zoo says 'come see the elephant, lion,

56

hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017). But "[t]he force of any negative implication," the Court held, "depends on context." *Id.* (quoting *Marx v. General Revenue Corp.*, 133 S.Ct. 1166, 1175 (2013)). Circumstances must support a "sensible inference" that the omitted term was intentionally excluded. *Id.* (citation omitted). Plaintiff fails to muster any contextual support that would suggest the regulation's drafters omitted reference to all other administrative costs by design. And as a practical matter, Plaintiff's position would impose onerous burdens on the drafters of agency regulations: drafters seeking to exclude categories from the scope of a regulation, as § 136.105(e)(8) does with respect to certain administrative costs, would need to engage in the cumbersome task of listing every conceivable like category that the drafters intend to except from the regulation's scope.

Reading § 136.105(e)(8) in the context of the Claims Regulations, its prefatory language, and its neighboring subparagraphs, with an eye to the regulation's overall purpose, further supports NPFC's interpretation. Section 136.105, titled "General requirements for a claim," sets forth pleading requirements. *See Almendarez-Torres v. United States*, 523 U.S.

224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (internal quotation marks omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, at 221 (2012) ("The title and headings are permissible indicators of meaning.").  Like other pleading provisions, *see, e.g.*, Fed. R. Civ. P. 8, 9(b), § 136.105's import is purely procedural.  It does not establish substantive rights, such as entitlement to compensation for administrative costs.  *See Johnson v. Ramesh Vemuri, Horizons, Ctr. for Counseling Servs.*, No. 94 C 2005, 1994 WL 695527, at *5 (N.D. Ill. Dec. 9, 1994) (finding state law analog to Rule 8 of the Federal Rules of Civil Procedure is "indisputably a procedural provision," that "neither creates nor destroys any substantive right.") (citations omitted); *see also Colley v. Procter & Gamble Co.*, No. 1:16-CV-918, 2016 WL 5791658, at *15 (S.D. Ohio Oct. 4, 2016) (noting that Rule 8, like other Federal Rules of Civil Procedure, "do[es] not alter substantive rights among the parties").  For example, subsections (a) through (d) of the regulation, which describe a claimant's burden of proof, the level of specificity required, when to amend a claim, amendments to the claim, and signature requirements, are thoroughly procedural in character.  *Cf. Erlenbaugh v. United*

*States*, 409 U.S. 239, 244 (1972) ("individual sections of a single statute should be construed together").

The relevant provision falls under § 136.105(e), which begins with prefatory language stating what "[e]ach claim must include." *Cf. Reading Law*, at 219 ("prefatory text can suggest only which permissible meanings of the enactment should be preferred"). Subparagraph (e)(8) is but one of thirteen items that claimants seeking recoveries from the Fund must include in their claim to attain relief. Other enumerated claim requirements include information like the "name, street and mailing addresses" for the claimant, the "date, time, and place" of the oil spill incident, a "general description of the nature and extent of the incident," "[e]vidence to support the claim," and communications between the claimant and RP. 33 C.F.R. § 136.105(e)(1), (2), (4), (6), (10). By design, the regulation requires claimants to bolster their claim with as much information as possible so that the NPFC can reasonably determine whether reimbursement from the Fund is warranted. This is reinforced by the final, catchall provision, which requires claimants to include in their claim, "any other *information* deemed relevant and necessary" by the Director, NPFC, to properly adjudicate the claim. *Id.* § 136.105(e)(13) (emphasis added). Nowhere does 33 C.F.R. § 136.105, or § 136.105(e) in particular, purport to enhance or limit, create or

59

destroy, any rights or entitlement, as Plaintiff's construction would suggest.

Finally, the OPA statute itself, which the Claims Regulations implement, cuts against Plaintiff's position, which, if adopted, would effectively expand the scope of compensable damages to administrative costs.  The OPA defines "damages" as those "specified in section 2702(b) of this title, and includes the cost of assessing these damages."  33 U.S.C. § 2701. Section 2702(b) begins, "[d]amages . . . *are* the following," and proceeds to enumerate six categories of compensable damages. The word "are" connotes a fixed, exhaustive list, whereas a word such as "includes," suggests a non-exhaustive list.  *See Bernal v. NRA Grp., LLC*, 930 F.3d 891, 894 (7th Cir. 2019) ("[T]he word 'including' generally 'introduces examples, not an exhaustive list.'") (citation omitted).  The statute thus recognizes six types of damages, along with assessment costs therefor, but nothing more.  Thus, there is no authority in the OPA, express or implied, that allows reimbursement of administrative costs.

## 2.   Statutory Interpretation

Setting aside NPFC's distinction between recoverable "assessment" and non-recoverable "administrative" costs, Plaintiff objects to NPFC's wholesale denial of the GRS Demand, despite acknowledging that GRS performed at least some compensable damage assessment activities.  (Pl.'s Mot. 18-19.)

60

According to Plaintiff, NPFC's decision not to reimburse any portion of the GRS Payment was arbitrary and capricious. (*Id.*) For example, the Adjudicator stated it was "likely that GRS performed some activities that would qualify as compensable assessment costs," that Meredith Management engaged GRS to provide expertise to "assess and evaluate the third party damage claims," and that some of GRS's work "likely qualifies as assessment costs." (*See* GRS Decision 6-8.)  Plaintiff maintains that once NPFC determined that some portion of GRS's work qualified as compensable OPA damages, NPFC was obliged to determine the quantum of damage, and not reject the claim in its entirety. (Pl.'s Mot. 18, 23.)

The court construes Plaintiff's motion as implicitly challenging NPFC's statutory interpretation of the OPA. Plaintiff's challenge fails to grasp that the interplay of several OPA statutes requires a responsible party, or its subrogee, to link damages and assessment costs for which it seeks compensation from the Fund, to *specific* third-party claims.  At bottom, NPFC denied the GRS Demand because Claimants' could not link GRS's costs, whether assessment-related or administrative, to *specific* third-party damages claims. (*Id.* 6.)  Despite NPFC's repeated requests for information, Claimants were unable to furnish evidence of the amount of time GRS's employees spent working on OPA compensable

61

third-party claims.  This deficiency was fatal to the GRS Demand.  The reason why becomes clear when parsing the text of the OPA, specifically its provisions governing "claims," "damages," authorized uses of the Fund, and the subrogation rights of responsible parties.

The Fund is authorized to make payments of *claims* for uncompensated damages.  33 U.S.C. § 2712(4).  A "claim" is "a request, made in writing for a sum certain, for compensation for *damages* . . . resulting from an incident."  *Id.* § 2701(3) (emphasis added).  As discussed earlier, "damages" are limited to six specific categories, among them "injury to . . . real or personal property, which shall be recoverable by a claimant who owns or leases that property."  *Id.* § 2702(b)(2)(B).  The "cost of assessing these damages," as noted previously, is likewise included in the scope of damages.  *Id.* § 2701(5).  As Defendants note, "'these' is a demonstrative adjective clarifying that the assessing must be for the damages 'specified in section 2702(b).'"  (ECF No. 30-2, United States' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Cross-Mot.") 18.)  This clearly implies that assessment costs are recoverable for only valid, compensable damage claims, which have occurred as the result of an oil spill incident.

Further, a responsible party may submit a claim directly to the Fund for uncompensated sums paid to third parties who incurred property damage resulting from an oil spill. 33 U.S.C. § 2713. Under such circumstances, the responsible party is subrogated to the third-party claimant's rights. *Id.* § 2715. Thus, where responsible parties and their insurers seek reimbursement from the Fund for payments made on account of third-party property damage claims, their recovery is limited to damages that are OPA-compensable. It follows that the responsible party may only recover assessment costs for third-party damage claims where the underlying claim itself was compensable. The logical implication, is that a responsible party or its insurer must link assessing expenses to a specific, compensable damages claim, so that NPFC is appropriately satisfied that any sums disbursed from the Fund constitute an authorized use of its reserves under 33 U.S.C. § 2712.

NPFC advanced this very construction of the OPA when it denied the GRS Demand:

> The definition of damages includes the costs of assessing the damages. If there are no compensable damages, by deduction, there are no reasonable costs of assessing them. So, when a claimant cannot be paid for damages for one reason or another, the assessment costs related to that claim also cannot be paid. If the damages do not exist or if they were the result of some other cause, such as Super Storm Sandy, there is nothing to assess under the OPA, and thus, nothing to be reimbursed. Thus, the assessment costs associated with the third party claims denied by either the

RP/Claimants or the NPFC are not reimbursable from the Fund or to the Fund. (GRS Decision 13.)[15]

NPFC's interpretation flows directly from the plain text of the relevant OPA statutes—sections 2701, 2702, 2712, and 2715. And even if, *arguendo*, the above statutes were ambiguous, NPFC's interpretation is a manifestly reasonable reading of laws that it is directly charged with administering, thereby entitling NPFC's construction to *Chevron* deference.

### B. The GRS Decision Was Not Arbitrary and Capricious

Having affirmed NPFC's legal interpretations, the only remaining question is whether its explanation for denying the GRS Demand is supported by substantial evidence. The court finds NPFC properly examined the "relevant data and [] set out a satisfactory explanation, including a rational connection between the facts found and the choice made." *Karpova*, 497 F.3d at 268 (citation omitted).

In the main, Plaintiff contends Claimants proffered sufficient evidence to allow NPFC to determine the extent to which "GRS services were attributable to damage assessments for properly paid damage claims versus other non-compensable activities." (Pl.'s Mot. 20 (quoting GRS Decision 6).) This evidence included, *inter alia*: numerous GRS invoices, with time

---

[15]     NPFC provided a substantially identical analysis six months earlier when it reimbursed Claimants for most of the Belson Demand. (*See* Belson Decision 5-7.)

sheets detailing the daily work hours and billing rates for each GRS employee; employees' daily activity reports, with brief narrative descriptions of the work performed; and, the Gutman Declaration. (*Id.* 20-21.)  Plaintiff maintains the Gutman Declaration, which estimated how much time each GRS employee spent working directly on damage assessment duties, should have allayed NPFC's particular concerns about the allocation of GRS's costs between recoverable and non-recoverable activities. (*Id.* 21.)  But NPFC, in Plaintiff's view, either improperly ignored or did not give weight to this evidence. (*Id.*)  By not crediting Claimants' submissions, and at least partly reimbursing the GRS Payment, Plaintiff asserts NPFC "imposed an elevated evidentiary standard which could not possibly have been satisfied." (*Id.* 22.)  The court disagrees.

Claimants had the burden of providing all required evidence, information, and documents to support the GRS Demand. *See* 33 C.F.R. §§ 136.105(a), 135.106(e)(6).  Further, the NPFC's Director deems what evidence is necessary to support a claim. *Id.* § 135.106(a).  Here, NPFC considered Claimants' evidence, and discussed it in great detail, but ultimately assigned it little to no weight, or otherwise deemed it insufficient to establish recoverable costs under the OPA.  Ultimately, no matter how voluminous Plaintiff's evidentiary submissions, without credible evidence parsing damage assessment activity

from administrative work, or, more importantly, linking GRS's work and hours to specific third-party claims, NPFC lacked a rational basis to grant Claimants recovery for the GRS Demand.

Plaintiff cites no evidence in the Administrative Record that suggests NPFC erroneously rejected the GRS Demand. To begin with, Meredith Management's purchase order for GRS's services states that GRS was to "[p]rovide personnel, equipment and materials to *administer* third-party claims . . . ." (US012607; US009517.)  The purchase order says nothing of assessment activities or damage estimation.  After NPFC initially denied the GRS Demand, Claimants submitted Mr. Gutman's Affidavit, which attached a spreadsheet detailing each GRS adjuster/assessor's activities with respect to each individual third-party damage claim.  (US012331-84.)  Although the spreadsheet details the work performed by each adjuster for each third-party claim, it does not convey any information regarding how much time was actually spent on those activities. Without this data, NPFC lacked a coherent basis to allocate costs for compensable claims.

The Gutman Declaration, submitted on reconsideration after NPFC first denied the GRS Demand, attempted to fill this gap by breaking down the percentage of time each GRS employee worked on compensable damage assessment activities, versus other, assessment-related work.  (Gutman Decl. ¶ 16.)

66

Ultimately, Mr. Gutman's allocation was *ipse dixit*, untethered to contemporaneous records or other competent evidence.  The Adjudicator reasonably decided not to credit the Gutman Declaration, because neither the OPA nor Claims Regulations authorize reimbursing a claimant "for an unsupported estimated percentage of costs incurred by the RP/Claimants to assess damages for the claims submitted to the RP for adjudication." (GRS Decision 11.)  Even if the Adjudicator accepted Mr. Gutman's allocations, the declaration failed to link the time spent by GRS employees on purported assessment activities to specific, compensable third-party claims.  Claimants also did not provide personnel hours and expenses related to individual third-party claims, or complete field notes, as NPFC requested. *See Jian Hui Shao*, 546 F.3d at 157–58 ("[W]hen a petitioner bears the burden of proof, his failure to adduce evidence can itself constitute the 'substantial evidence' necessary to support the agency's challenged decision.") (citing *Zhou Yun Zhang v. INS*, 386 F.3d 66, 78–79 (2d Cir. 2004)).

As an indication of NPFC's allegedly arbitrary decision-making, Plaintiff note that Clean Harbors Cooperative LLC ("Clean Harbors"), an Oil Spill Removal Organization ("OSRO") hired to respond to the oil spill, was reimbursed for apparent administrative costs, including invoices on behalf of administrative assistants.  (Pl.'s Mot. 11.)  Defendants note

67

that this evidence comes through the Affidavit of Attorney
William Pallas, Esq., dated July 25, 2019, a submission
extrinsic to the Administrative Record.  (Defs.' Cross-Mot. 28.)
In any event, the relevant invoice concerns removal costs, which
are recoverable from the Fund under 33 U.S.C. § 2712(a)(1).  In
the context of removal costs, which are distinct from "damages,"
the Fund may reimburse charges of an OSRO based on the removal
directions of the Federal On-Scene Coordinator ("FOSC"), who has
broad authority to determine which removal activities should be
conducted and what costs should be incurred during an OPA
incident. 40 C.F.R. Part 300.  As Defendants point out, removal
costs thus present a different analysis, "because it depends on
what removal action the FOSC determined to be consistent with
the National Contingency Plan."  33 C.F.R. § 136.205.

        Finally, Plaintiff argues that given NPFC's
acknowledgement that some of GRS's costs were likely incurred
performing compensable activities, NPFC should have at least
held an inquest or evidentiary hearing, with live testimony from
GRS witnesses, to ascertain what portion of the GRS Demand was
compensable.  (Pl.'s Mot. 22.)  Neither the OPA nor Claims
Regulations confer any right to such a hearing.  *See Bean
Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 75 (D.D.C.
2011) (OPA "[does] not confer upon such parties a right to a
formal hearing, a right to present rebuttal evidence or

argument, or really any procedural rights at all."). Because the APA does not require a hearing in an informal adjudication, this court would exceed its authority if it were to "impose procedures on [NPFC] that are not mandated by the [APA] or by other statute or regulation.  Administrative decisions may be set aside 'only for substantial procedural or substantive reasons as mandated by [the] statute.'" *Guitard v. U.S. Sec. of Navy*, 967 F.2d 737, 742 (2d Cir. 1992) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).

Accordingly, the court finds the GRS Decision was not arbitrary and capricious, and will not set it aside.

## II.  The Mayship Decision

Plaintiff also submits that NPFC's denial of the Mayship Demand was arbitrary, capricious, and an abuse of discretion.  (Pl.'s Mot. 27.)  For the reasons that follow, the court declines to set aside the Mayship Decision.

### A. Lost Profits

Plaintiff objects to NPFC's factual analysis in the Mayship Decision.  Although NPFC's interpretation of the relevant law is not presently subject to challenge, the court will briefly discuss the pertinent statutes and regulations governing claims for lost profits under the OPA.

The OPA recognizes lost profits as allowable damages. Pursuant to 33 U.S.C. § 2702(b)(2)(E), claimants may recover damages "equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources . . . ." Beyond a claimant's general burden of providing all evidence, information, and documentation to support its claim, *see* 33 C.F.R. §§ 136.105(a), 136.105(e)(6), the Claims Regulations impose additional pleading demands on claimants seeking reimbursement from the Fund for lost profits.

These particular pleading requirements are clearly designed to aid NPFC in determining the causal link between the oil spill and removal, on the one hand, and the claimant's alleged business interruption losses, on the other.  A claimant "must establish," *inter alia*, that: its income was reduced as a consequence of injury to, destruction of, or loss of the property or natural resources, along with the amount of that reduction; the claimant's earnings or profits in comparable periods and during the period when the claimed loss was suffered, based on supporting documents like income tax returns, financial statements, and similar documents; comparable profits or earnings for same or similar activities outside of the affected area; and whether claimant pursued alternative

business, if available, and the amount of income derived therefrom.  33 C.F.R. § 136.233.

The regulations further limit allowable compensation for lost profits to the "actual net reduction or loss of earnings or profits suffered."  33 C.F.R. § 136.235.  In order to make this showing, a claimant must furnish calculations for net reductions that clearly reflect adjustments for: "(a) All income resulting from the incident; (b) All income from alternative employment or business undertaken; (c) Potential income from alternative employment or business not undertaken, but reasonably available; (d) Any saved overhead or normal expenses not incurred as a result of the incident; and (e) State, local, and Federal taxes."  *Id.*

## B. The Mayship Decision Was Not Arbitrary and Capricious

Plaintiff argues that NPFC's refusal to reimburse Claimants for the Mayship Payment was contrary to the evidence, and inconsistent with the Adjudicator's acknowledgement that there was "some evidence that Mayship Repair was impacted by the oil removal activities from December 15, 2012 through January 4, 2013." (Pl.'s Mot. 27 (quoting Mayship Decision 6).)  According to Plaintiff, once NPFC acknowledged that the presence of oil spill contractors on Mayship's premises impacted business operations, it had to "analyze the evidence submitted concerning the economic impact that the interruption had on Mayship's

71

business and, ultimately, make a determination as to the quantum of business interruption damages suffered by Mayship." (*Id.* 28.) Plaintiff claims that "NPFC failed to properly consider" the evidence before it, such as the "detailed Perullo Declaration and other evidence submitted in support of the Mayship claim." (Pl.'s Reply 14 n.8.)

Contrary to Plaintiff's assertions, NPFC analyzed and devoted thorough attention to Claimants' evidence in its analysis, and arrived at a well-reasoned conclusion. Even though NPFC found evidence of cleanup crew presence at Mayship facilities in the two weeks immediately following the spill, there was no evidence of a continued presence thereafter, once major removal operations ceased. (Mayship Decision 7.) The record indicated only intermittent monitoring activities after January 4, 2013. The Adjudicator also declined to credit Claimants' contention that the absorbent boom in Mayship's vicinity impeded access to its dry docks, noting the boom was placed landside of Mayship's piers and docks. (*Id.* 8.) The Adjudicator also considered the impact of Hurricane Sandy, which made landfall in October 2012, only two months before the spill. NPFC acknowledged that Hurricane Sandy may have been an intervening or superseding cause of Mayship's alleged losses, citing Mr. Adam's statements in news articles about the extensive damage Sandy wrought on Mayship's facilities. (*Id.*

72

9.)   In short, NPFC found that Claimants failed to establish by
a preponderance of the evidence that removal activities
interfered with or impinged upon the productivity of Mayship's
employees.  (*Id.*)

At the heart of NPFC's denial, was "persuasive
evidence" that Claimants' $575,000 payment to Mayship was a
"negotiated settlement," which lacked a clear basis in Mayship's
actual documented losses arising from the removal activities.
(Mayship Decision 10.)   NPFC found it telling that Claimants
only obtained and produced Mayship's financial statements in
response to NPFC's request for additional information.  Indeed,
Mr. Perullo conceded that Mayship's financial statements "were
not made available for [GRS's] review prior to the resolution of
Mayship's claim."  (Perullo Decl. ¶ 22.)  Without Mayship's
financials, it is unlikely Mr. Perullo could have rationally
verified Mayship's lost profits due to the spill.  The
Adjudicator thus inferred that Claimants could not have known
the extent of Mayship's business interruption losses at the time
of the Mayship Payment, if Claimants themselves did not possess
Mayship's relevant financial statements.  (Mayship Decision 10-
11.)  Accordingly, the Adjudicator reasonably determined that
the Mayship Payment represented a negotiated settlement, rather
than Claimants' dollar-for-dollar compensation of Mayship's
documented lost profits.

The financial statements, moreover, showed that Mayship sustained a net loss in two of the four years documented, and that the $575,000 Mayship Payment exceeded Mayship's combined annual profits in all four of those years. (Mayship Decision 11 n.38.)  The Adjudicator simply could not square the Mayship Payment with a credible claim for actual business interruption losses, given Mayship's historical performance.  Moreover, Claimants did not provide NPFC with written contracts or cancellation records for Mayship's four Lost Jobs.  Without these documents, NPFC could not rationally determine how Mr. Perullo arrived at a valuation of Mayship's losses.

In sum, NPFC reasonably denied the Mayship Demand because Claimants failed to establish that Mayship's financial loss from the Lost or Delayed Jobs was due to the oil spill, and could not demonstrate how the settlement payment to Mayship was reflective of actual lost profits.  Accordingly, the court affirms the Mayship Decision.

## CONCLUSION

For the reasons set forth above, the court GRANTS Defendants' cross-motion for summary judgment, and DENIES Plaintiff's motion for summary judgment.  Plaintiff has failed to establish that NPFC's actions exceeded legal authority, were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  The agency properly complied with the underlying statute, the Oil Pollution Act of 1990, and the promulgated regulations, 33 C.F.R. Part 136.  Therefore, the court will not set aside the GRS Decision or the Mayship Decision, and dismisses the Complaint with prejudice.  The Clerk of Court is directed to enter judgment in Defendants' favor and close this case.


**SO ORDERED.**

Dated: Brooklyn, New York
       September 24, 2020

                                        /s/
                                        _____
                                        **KIYO A. MATSUMOTO**
                                        United States District Judge
                                        Eastern District of New York